Thomas YOUNGER, Individually, and on behalf of others similarly situated, Plaintiffs,

v.

GLAMORGAN PIPE AND FOUNDRY COMPANY, a corporation, et al., Defendants.

Civ. A. No. 68–C–16–L.

United States District Court, W. D. Virginia, at Lynchburg.

Feb. 26, 1976.

Supplemental Opinion on Damages June 18, 1976.

---

4. See n. 3, *supra*.

S. W. Tucker, Henry L. Marsh, III, Randall G. Johnson, William H. Bass, III, Stephanie J. Valentine, Hill, Tucker & Marsh, Richmond, Va., Charles M. L. Mangum, Lynchburg, Va., Jerry L. Williams, Danville, Va., Jack Greenberg, Barry L. Goldstein, William L. Robinson, New York City, Robert Belton, Charlotte, N. C., for plaintiffs.

Francis T. Coleman, John R. Erickson, Counihan, Casey & Loomis, Washington, D. C., for defendant company.

William E. Mitch, John C. Falkenberry, Cooper, Mitch & Crawford, Birmingham, Ala., for defendant unions.

### OPINION

WIDENER, Circuit Judge, Sitting by Designation.

Thomas Younger instituted this action on behalf of himself and others similarly situated by filing a complaint in which he demanded relief on two counts. Count one of the complaint alleged, *inter alia,* that defendant Glamorgan Pipe and Foundry Company (hereinafter Glamorgan) (a) maintains a policy or practice of discriminating against plaintiff and other Negro persons similarly situated because of race or color with respect to compensation, terms, conditions and privileges of employment; (b) limiting, segregating and classifying the employees of defendant Glamorgan in ways which deprive plaintiff and other Negro persons similarly situated of employment opportunities and otherwise adversely affect their status as employees because of race or color, and (c) retaliating or discriminating against plaintiff and other Negro persons similarly situated because they have opposed practices made lawful under Title VII or because they have made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII. Count two of the complaint charged that defendants Steelworkers and Local 2864 have violated and continue to violate their duty of fair representation of plaintiff and all members of his class at the Company, in that they have acquiesced in the unlawful and discriminatory policies and practices complained of in count one and have failed to negotiate or attempt to negotiate the elimination of such policies.

■ As with many cases, the issues in this case became more precisely defined as the lawsuit progressed. The issues raised by count two were conceded by the plaintiff. During opening statement the following colloquy took place.

The Court: How have they failed to represent the plaintiff? Is that still in the case?

Mr. Marsh: No, sir, your Honor, that is not still an issue.

And later the following conversation transpired:

The Court: Is there any claim of discrimination within the union? Don't the black employees have just as much right to vote in the union as the white employees?

Mr. Marsh: That is not an issue in the case.

The Court: There isn't any issue of that?

Mr. Marsh: That is not an issue in the case.

Prior to trial the parties agreed that the following included all of the issues to be tried in this case.

a. Was plaintiff discharged on account of race?

b. Was plaintiff discharged on account of asserting his rights under the Equal Employment Opportunity Act?

c. Was plaintiff discharged for cause?

d. Was plaintiff denied opportunity for promotion on account of his race?

e. If the answer to question (d) is "yes," were other blacks so discriminated against?

f. If the answer to question (d) is "yes," is such discrimination yet occurring?

g. Was the plaintiff discriminated against in the matter of wages on account of his race?

h. If the answer to question (g) is "yes," were other black employees discriminated against in like manner?

i. If the answer to question (g) is "yes," is such discrimination yet occurring?

j. Was the plaintiff discriminated against in job assignments on account of his race?

k. If the answer to question (j) is "yes," were other black employees discriminated against in like manner?

l. If the answer to question (j) is "yes," is such discrimination yet occurring?

m. The back pay, if any, due the plaintiff $___.

It is apparent from the above questions that the court was of opinion, and the parties agreed, at the time these issues were drawn, that success of the class action aspect of this case depended upon the plaintiff's success in his individual causes of action, on the theory that if plaintiff has suffered none of the injuries of which he complains, he would not be a proper representative of the class which allegedly suffered similar injuries. The fourth circuit has rejected this reasoning in two cases similar to the instant case, *Cox v. Babcock and Wilcox Co.*, 471 F.2d 13 (4th Cir. 1972) and *Moss v. The Lane Co.*, 471 F.2d 853 (4th Cir. 1972). It is clear from *Cox* and *Moss* that the class action in this case may not be dismissed because the plaintiff Younger has failed to prove his claims. *Cox* and *Moss* do not change the substantive issues in this case and, since success of Younger's claim could not be measured until the end of the trial, evidence relevant to the class action aspect of this case was admitted throughout.

The Court will take up first the issues relating to the discharge of plaintiff Thomas Younger. Younger contends that he was not discharged for cause but instead was discharged on account of his race and on account of his having filed a complaint with the Equal Employment Opportunity Commission.

On November 20, 1963, plaintiff Thomas Younger filed an application for employment with Glamorgan. On December 16, 1963, Younger was employed by Glamorgan and he entered the labor pool at pay rate of $1.64.5 per hour. Because it was necessary to Glamorgan's operations to hire Younger immediately, he was employed on a probationary basis pending completion of the company's investigations and Younger's satisfactory performance on the job. His personnel file shows a report from a previous employer, B. G. Hesson Construction Co., which states that Younger left the job because of a dispute over whether or not he should do certain work. The report stated that the company would not rehire Younger because of his unwillingness to work; that Younger did not have the ability to get along with others or accept supervision willingly and that his job performance was poor. The company kept Younger as an employee in spite of this report.

When Younger went to work in 1963 he started in the labor pool as do almost all employees. From the labor pool he went to the soil pipe finishing department where he was trained to be a pipe cutoff saw operator. His duties included sawing off ragged pipe ends and rolling the pipe to scales for weighing. Younger joined the Union as soon as his waiting period was up and before long, on July 29, 1965 he was appointed grievance man, whose duty it was to attempt to iron out problems in his department. Younger testified that because of his activities as grievance man he was called an agitator by a certain John Wil-

liams who was superintendent of the plant. Younger filed a grievance on the matter which resulted in Williams denying that he had ever called Younger an agitator. The grievance report further shows that Younger asked for a transfer from his department. Younger testified that, following the grievance incident, company officials talked to him and encouraged him to quit his job because they thought he was unhappy and everybody would be better off if he found work elsewhere. Younger stayed on the job and was subsequently transferred. He denies that he asked for a transfer, but the more credible evidence is that he did ask for it. In any event, any issue as to his transfer is not in the case. Younger moved from the cutoff saw operator job to what he called a cupola job and then to silicon loader. His duties there were to load a prescribed amount of silicon into a bucket from which silicon would be dumped into a lorry and then into an electric furnace. Younger claims that he was given insufficient training for the job, though he also contends that he performed it satisfactorily. There were two lead men, Elder and Early, both white. Younger said that he followed their instructions including those pertaining to the amount of silicon to be put in the bucket. Younger testified that he began getting complaints that he was not properly loading the silicon bucket. Finally, Younger was fired, the stated reason being that he put no silicon in the bucket. On the day he was charged with putting no silicon in the bucket he was working with a man named Wesley who also was black. Another black employee, named Harvey, worked in close proximity with Younger. Wesley testified that Younger did put the silicon in the bucket on the day it was charged he did not. Harvey testified and first explained that he worked on the electric furnace charging block. The silicon would go up a ramp past him and be dumped into a lorry and then into the furnace. He testified that on the day Younger was fired, he observed that there was no silicon in the bucket. He also said that on previous occasions he would have to send the bucket back down to Younger to have silicon put in.

The court notes that Harvey testified in spite of the fact that he had previously been warned not to testify and threatened if he did so. Such threat was by way of an anonymous phone call.

The melting superintendent, Vest, testified and explained in more detail the nature of Younger's job. The ingredients which go into the electric furnace are carried to the furnace by a coke lorry. Limestone is first placed in the lorry, then coke, and then the ferro-silicon. Younger's job was to load the ferro-silicon into the lorry. At the beginning of the shift each day either the melting superintendent or the lead man would pick up a charge sheet from the laboratory. This sheet would prescribe the amounts of each ingredient to be added to the lorry. The silicon loader would be informed by the lead man how much ferro-silicon to place in the lorry. The silicon is weighed and added to a slide which has a lift gate. After the limestone and coke are added to the lorry, the silicon loader raises the gate and silicon slides into the coke lorry on top of the charge. The silicon loader then presses a button and the coke lorry goes up to the dumping position. Obviously Harvey was referring to the lorry when he said he sometimes had to send the "bucket" back down to Younger to have silicon put in. The silicon loader uses a bucket to weigh the silicon and dumps the contents of the bucket onto the slide referred to above. The ferro-silicon is always the top ingredient in the lorry and the charge operator (Harvey in this case) can see the charge. On January 24, 1967, Vest gave Younger an oral reprimand. Younger's lead men had complained that he was not adding silicon to every charge. Also, the lab analyses of the samples taken from the furnace showed a consistent reading of under 2% silicon while Younger was working. 2% was the proper amount. It had been explained to Younger that salable pipe had to have proper silicon composition, otherwise it was scrap. Vest testified that on the day before Younger was fired he issued another reprimand to Younger because of further complaints from lead men, inventory reports which in-

dicated silicon undercharging, further lab reports showing improper silicon loading and reports from the charge operator that insufficient silicon was being loaded. The next day, February 17, 1967, Vest was on the charging platform and he noticed that there was no silicon in the lorry. He directed Harvey, the charge operator, to hold the charge. Vest, Harvey and Early, a lead man, looked at the charge and there was no silicon. Vest confronted Younger with the situation and Younger denied failing to put the silicon in. Vest informed Younger that he was fired and directed him to report to the personnel office.

■ The court is of opinion that it is clear that Younger was discharged for cause and not on account of his race. His job was not a difficult one, yet its proper performance was essential to production of salable pipe. This was explained to him and he consistently failed to load the proper amount of silicon into the lorry. While Younger denied the alleged malfeasance and such denial was corroborated by his helper, Wesley, they were both contradicted by more credible evidence. Harvey corroborated Vest's version of the incident of February 17 and also testified that Younger frequently improperly loaded the ferro-silicon. The unsatisfactory lab reports and the inventory reports further indicated that Younger was not doing his job. The record is simply barren of evidence that Younger was discharged on account of his race. While his previous transfers are not at issue in this suit, the court notes that he was always replaced by a black man and there is no indication that such transfers were on account of his race.

As to the allegation that he was discharged because he filed an EEOC complaint, there is a similar dearth of evidence. The record shows that on March 14, 1967, Younger filed an amended charge before the EEOC concerning his discharge. Apparently the first EEOC complaint concerned the August 1966 transfer of Younger into another department. Of course the March 14, 1967 EEOC complaint could not have influenced his discharge because it was filed after the discharge. Younger testified that he filed an EEOC complaint in August of 1966 concerning his transfer. Younger testified on cross examination that the company knew, before he was discharged, that he had filed an EEOC complaint. Younger admitted, though, that he could not recall having told any company official that charges had been filed. At this point, Younger's deposition was read which indicated that he had not told the company about the EEOC complaint. Assuming that the company did know about the EEOC complaint when Younger was discharged (an assumption not warranted by the evidence) there is a further lack of evidence that knowledge of such complaint had anything to do with Younger's discharge. On the evidence before the court the conclusion is inescapable that Younger was fired for cause and not on account of his race or his EEOC complaint.

As far as issues d and g are concerned (was Younger denied promotion or opportunity for promotion because of race and was Younger discriminated against in the matter of wages) the evidence does not show any incidents of discrimination against Younger. Likewise, as to issue j (concerning job assignments), Younger failed to prove that during his job tenure he was discriminated against on account of his race in regard to job assignments. However, it will be discussed subsequently whether the defendant's system of transfers and seniority affecting promotion, job assignments, and wages tends to discriminate against blacks generally.

Turning to the issues of promotion, pay and job assignments with regard to the class, it is first necessary to describe defendant's operation to the extent discernible on this record. Glamorgan is basically divided into 17 departments. All jobs paid on an hourly wage rate are classified into labor grades. Any department may contain any combination of labor grades. For example, the melting department contains eight different labor grades. The highest paid worker in the maintenance department is the lead man who is in labor grade 12 in

which the base pay is $4.195 per hour. Labor grade 9 in maintenance is occupied by a millwright whose base pay is $3.61 per hour. Thus, regardless of department, the labor grades are paid the same base pay. Obviously, the departments which perform skilled labor have more high labor grades than departments which do unskilled labor.

The company has, at least since 1965, recognized company and departmental seniority. The seniority system is and has been embodied in the collective bargaining agreements executed by the union and the company. Approximately one half of the union's membership is black and the union supports the seniority system. Nearly all employees enter the plant in the labor pool, but regardless of which department they start in, company seniority accumulates beginning on the first day after the employee has worked continuously for three months. Company seniority continues as long as an employee is employed on a continuous basis. Departmental seniority, like company seniority, can not accrue until the employee has worked in the plant for three months. Department seniority does not accrue until an employee has worked in the department for 30 days. (Thus, if an employee commenced his employment with the company in the melting department and worked there continuously for three months, plant and department seniority would begin to accrue at the same time, that is the first day after the end of the three month probationary period. If an employee went into the melting department with say two years' company seniority he would have to wait thirty days for department seniority to accrue.) The salient point about department seniority is that a permanent transfer to another department works a forfeiture of the employee's departmental seniority in the old department. That is, he must enter the new department with no departmental seniority. A departmental transfer does not affect company seniority of any kind.

The seniority system is basically a job security provision. A man in a low paying hard working job may be reluctant to transfer into an easier, higher paying job because, as the low man in his new department he would be the first to be bumped in the event that a job in the new department is eliminated. And he could not revert to his old department because his seniority was lost there when he transferred out. It was adduced at trial however that all is not lost when an employee is bumped from his new department. He would return to the labor pool with his plant wide seniority. There is no departmental seniority in the labor pool; such an employee would enter the labor pool and be in a better position there than anyone with less plant seniority. The court recognizes that a return to the labor pool might be a serious step down for an employee, but the court also notes that such an employee is substantially protected against loss of employment.

The seniority system is basically what this suit is all about. The plaintiffs contend that blacks were historically placed into the lower paying, less desirable jobs and that they can not get out of those jobs because they do not want to risk losing seniority in their department. Of course, the loss of seniority is not peculiar to blacks. Any employee with any appreciable department seniority is faced with the same choice on the question of transfer—the risk is the same for all, black or white. But plaintiffs claim that the system while perhaps not discriminatory on its face, has the effect of freezing blacks into departments and jobs in which they were placed on account of their race.

The plant maintains a job bidding system which also bears on this issue. Prior to 1965, when jobs opened up in the plant the department foreman would more or less go out and pick someone to move up. There was no job bidding or posting of job openings. Often a man in the department would be chosen to move up but the foreman might go outside the department. In 1965 a job bidding system started. The present operation of that system was as follows: When a vacancy occurs in any department, a bid is posted for a period of three days. The bid states the department, the department number, the date of the

posting, the name and labor grade of the job, and the pay rate. Up until around 1969, the bids were restricted to the department in which the job opening existed. After that time, anyone from any department could sign the bid. The bid is taken down after three days and the persons who signed the bid are evaluated by the supervisor or the foreman, either or both. All bidders may be rejected and a more qualified person might be solicited. The 1965 collective bargaining agreement required posting of bids, and they have been posted since that time. When the bidding system started, most bids recited the fact that persons outside the department need not apply, although there was evidence that the practice was for anybody who wanted the job to sign the bid. In any event, bids are no longer restrictive and the open bidding practice started around 1969.

 With this system of seniority, transfers, and bidding in mind the court must consider the evidence, if any, of discrimination. At the outset, the court notes that the sum of the oral testimony failed to show that black employees were or are discriminated against at Glamorgan. In a factory employing over 450 wage earners, several incidents of a white worker referring to a black worker in disparaging terms does not amount to a Title VII case of discrimination. The difficult part of this lawsuit results from the exhibits which show that blacks predominated in the lower paying and less desirable jobs. Not even the exhibits show that any company action resulted in this situation. The court is aware that lack of intent to discriminate is no defense. As long as the company maintained a system which had or has a discriminatory effect, Title VII is violated. *Quarles v. Philip Morris, Inc.,* 279 F.Supp. 505 (E.D. Va.1968); *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971). If it be shown that the accumulation of black employees in such jobs is not a result of racial discrimination, plaintiffs would be entitled to no relief.

Plaintiffs called first Lewis C. Moorman, personnel director at Glamorgan since 1961.

It was adduced from Moorman, *inter alia,* that the company has no black officials, or technicians. There is one black supervisor. One of the clerical personnel is black. There are two black foremen. Of the four employees who have received vocational training, none are black, but no black employee has ever asked for such training. No blacks have ever completed the apprentice training program, but no black has ever been turned down for such training. There are four black lead men out of a total of 28.

Plaintiffs next called Milton Thomas Ferrell, a black employee who has been employed at Glamorgan since 1959. Ferrell started as a laborer in the melting department. Ferrell stated that a white man named Williams was promoted ahead of him even though Williams had less departmental seniority. Williams became a carbon injector in the melting department even though Ferrell had been in the department a longer time. Williams did, however, have greater plant seniority. Ferrell testified that a white man named Eubank was also advanced ahead of him. Eubank was given training to become a melting bridge crane operator and subsequently given the job, even though Ferrell had greater departmental seniority. Ferrell had less plant seniority. Two other white men, James Eubank and J. R. Campbell were given jobs as carbon injectors while Ferrell was still a slag man. Ferrell's departmental seniority exceeded that of both of these men. The court notes that assuming plaintiff's theory that plantwide seniority should be used, three of these four men should have been promoted ahead of Ferrell. Cross-examination revealed that in 1969 Ferrell was offered the job as lead man in the melting department. His foreman approached him, offered him the job and asked him to sign the bid for the job. Ferrell was not interested. Another black man, Brown, was likewise uninterested. Ferrell was also offered a lab technicians's job and related training in 1969 which he turned down. He was later offered a job as control supervisor which he also turned down. Ferrell did not want any salaried job because it would

mean he would have to give up union involvement. Ferrell's testimony also showed that the union has favored the departmental seniority system and the union is 50% black.

J. E. Williams testified and stated that he had been with Glamorgan for forty-one years, during which time he held many jobs, from laborer to supervisor. At the time of his testimony he was supervisor of Delavaud Casting, and Cleaning and Cement Lining. Williams testified that, to his knowledge, foremen did not play a very important role in selecting men for job assignments, and that basically it was the supervisor's choice. He testified that the criteria was seniority, ability and attendance record. When Williams first became supervisor the black to white ratio in his department was around 50-50. Presently he has about 60 blacks and 20 whites under his jurisdiction. His lead man and foreman are white.

As previously indicated, Younger himself testified as did his co-worker Wesley. Their testimony went primarily to Younger's individual claim of discrimination, and their testimony did not touch on other relevant matters.

William Callahan, a black employee, was called by plaintiff. The purport of his testimony is not clear. He had, prior to coming to Glamorgan, experience as a crane operator and he wanted to operate a crane at Glamorgan. He has been a crane operator in two departments at Glamorgan, and he was, at the time of trial, a crane operator. Callahan wanted to fill an existing vacancy for crane operator, he signed a bid and got the job. About a year into this job, Callahan complained that he should be paid at a higher labor grade. The company agreed, the job was re-evaluated and he was given back pay. Callahan did say that after he got his back pay, they started letting another higher paid man come in and operate the crane on Saturdays. He testified that he was getting bad remarks from people and being called names he did not want to use on the witness stand. Callahan discussed that his job was going to be automated so

he bid on another job as crane operator, which job he received. Callahan was later recalled, at which time he stated that he would not bid on another job regardless of the circumstances because he liked the job he had. Callahan and Ferrell both were better witnesses for the company than for the plaintiff.

T. H. Farrow, a black employee, testified that he had never bid on any jobs because he was unwilling to run the risk associated with the loss of departmental seniority. Farrow also testified that Tripplet, the man who allegedly harassed Younger, often called black employees "boys."

■ Plaintiff's attorneys attempted to offer the entire deposition of two Glamorgan officials with the officials present. The court rejected the depositions as offered only in their entirety. Plaintiffs had the opportunity to question these men as adverse witnesses or to read any statements they had made. Of course they could use the depositions to impeach if necessary. The attorneys were advised they could use any parts of the depositions as admissions against interest. But the court refused to allow the whole depositions to be dumped into the record. In all events, the depositions have been improperly filed.

Plaintiffs also filed a considerable number of exhibits, as did defendants, and these have been considered along with the testimony. Defendant's oral evidence went mainly to rebuttal of Younger's individual claim, which has heretofore been discussed. Defendant called Lewis Moorman who had previously testified for plaintiff. One significant point of Moorman's testimony was that the job bids which were posted prior to 1969 purported to be limited to applicants within the department in which the opening existed. Moorman had already testified that the rule was more honored in the breach than in the observance so that it was ultimately abolished. Colloquy with counsel at this time revealed more clearly what this lawsuit is all about. Plaintiffs maintain that the job bidding system in conjunction with the seniority system with the inner-departmental restrictions which did ex-

ist at some point, tended to discourage black employees from bidding into more desirable predominantly white departments. The court questioned counsel as to whether there was any evidence of discrimination in the actual process of awarding bids. Counsel for plaintiff replied that it might come out in later testimony. Plaintiff had at this time rested his case and it would seem that any evidence on discrimination in job bid awards would have been adduced during his case. Such later testimony was never forthcoming.

Defendant called Thomas Howell Upchurch who has held, among other positions, the job of Equal Employment Opportunity officer for the plant since 1969. His basic responsibility is insuring that the company has in effect an affirmative action program and adheres to fair employment practices with regard to race and sex. Upchurch was questioned, as were other witnesses, concerning the incentive system at which time plaintiff informed the court that they do not contend that race is in any way connected with incentive pay. The major thrust of Upchurch's testimony was that he works closely with management to insure fairness with regard to race and employment. He stated that training, promotion and transfers are done without regard to race.

■ Various documents filed as exhibits portray the total number of employees and the racial composition thereof. A review of these exhibits gives rise to the following approximation for 1971: total hourly paid employees in bargaining unit: 471; total black employees in bargaining unit: 234; percentage of black employees since 1965 is 45%.[1] The more important figures are those of the various departments which are as follows:

As of 12–31–71

| Department | # black | # white | Total |
|---|---|---|---|
| 1. foundry | 29 | 30 | 59 |
| 2. melting | 26 | 14 | 40 |
| 3. delavaud casting | 17 | 11 | 28 |
| 4. shipping & misc. | 24 | 12 | 36 |
| 5. maintenance | 8 | 72 | 80 |
| 6. machine shop | 0 | 21 | 21 |
| 7. delavaud finishing | 46 | 4 | 50 |
| 8. shell core | 5 | 9 | 14 |
| 9. soil pipe casting | 8 | 9 | 17 |
| 10. soil pipe finishing | 14 | 6 | 20 |
| 11. flange pipe | 0 | 4 | 4 |
| 12. plastic pipe | 5 | 17 | 22 |
| 13. labor pool | 39 | 13 | 52 |
| 14. transportation | 0 | 2 | 2 |
| 15. inspectors | 7 | 13 | 20 |
| 16. storeroom | 1 | 5 | 6 |
| 17. permanent mold | 5 | 1 | 6 |
| unknown | 2 | 2 | 4 |
| Totals | 236 | 245 | 481 |

As of 12–31–70

| Department | # black | # white | Total |
|---|---|---|---|
| 1. foundry | 49 | 40 | 89 |
| 2. melting | 24 | 13 | 37 |
| 3. delavaud casting | 12 | 11 | 23 |
| 4. shipping & misc. | 21 | 11 | 32 |
| 5. maintenance | 7 | 69 | 76 |
| 6. machine shop | 1 | 23 | 24 |
| 7. delavaud finishing | 41 | 5 | 46 |
| 8. shell core | 7 | 11 | 18 |
| 9. soil pipe casting | 8 | 10 | 18 |
| 10. soil pipe finishing | 14 | 6 | 20 |
| 11. flange pipe | 0 | 4 | 4 |
| 12. plastic pipe | 5 | 11 | 16 |
| 13. labor pool | 34 | 9 | 43 |
| 14. transportation | 0 | 2 | 2 |
| 15. inspectors | 9 | 11 | 20 |
| 16. storeroom | 0 | 4 | 4 |
| 17. permanent mold | 3 | 1 | 4 |
| unknown | 2 | 2 | 4 |
| Total | 237 | 243 | 480 |

1. The population make-up for Lynchburg and its surrounding communities of Campbell, Bedford, and Amherst Counties, and Bedford City is: Lynchburg City, white 76.6%, black 23.3%, other .1(–)%; Lynchburg Community including Lynchburg City, white 81.3%, black 18.4%, other .3(–)%.

As of 8–11–65

| Department | # black | # white | Total |
|---|---|---|---|
| 1. foundry | 44 | 51 | 95 |
| 2. melting | 24 | 13 | 37 |
| 3. delavaud casting | 10 | 19 | 29 |
| 4. shipping & misc. | 23 | 33 | 56 |
| 5. maintenance | 3 | 65 | 68 |
| 6. machine shop | 0 | 21 | 21 |
| 7. delavaud finishing | 44 | 7 | 51 |
| 8. shell core | 2 | 16 | 18 |
| 9. soil pipe casting | 1 | 12 | 13 |
| 10. soil pipe finishing | 9 | 9 | 18 |
| 11. flange pipe | 0 | 4 | 4 |
| 12. plastic pipe | 1 | 9 | 10 |
| 13. labor pool | 17 | 12 | 29 |

lead men for 1965 figures

| | # black | # white | Total |
|---|---|---|---|
| foundry | 0 | 6 | 6 |
| melting | 0 | 1 | 1 |
| shipping & misc. | 1 | 2 | 3 |
| maintenance | 0 | 2 | 2 |
| delavaud finishing | 0 | 3 | 3 |
| shell core | 0 | 1 | 1 |
| soil pipe casting | 0 | 2 | 2 |
| soil pipe finishing | 0 | 1 | 1 |
| flange pipe | 0 | 1 | 1 |
| plastic pipe | 1 | 1 | 2 |
| Total | 186 | 308 | 494 |

The above charts reveal that blacks have tended to predominate in melting, delavaud finishing, soil pipe finishing, and the labor pool. The labor pool, however, is not a typical department in that it is comprised mainly of new hires and there is no risk of loss of departmental seniority when transferring from the labor pool. Shipping and miscellaneous is not included because the pay of black employees in that department is greater than whites. Permanent mold is not included because four employees is an insufficient statistical sample, no other evidence of discrimination appearing.

The company offered no evidence to show why blacks tended to predominate in the above departments. Plaintiff offered no evidence that the above figures were the result of any racial discrimination. Plaintiff called no witnesses who could say they wanted to get out of their department and could not. In fact, the witnesses actually called by plaintiff support the inference that black employees do not want to move into other departments and they like the jobs they have. That inference may be taken at somewhat less than full value in view of the fact that very few witnesses testified. But it would seem that if blacks wanted to transfer and felt they could not, plaintiff could have called at least one to so testify.

The departments in which blacks tend to predominate are alleged to be undesirable departments. Undesirable is a vague term, but for the purposes of this law suit, the court considers it to mean primarily low pay and hard work. It was discussed earlier that all jobs are given a labor (or pay) grade and that each department will have various grades within it. The following chart depicts the pay ranges for each grade:

| | | | | |
|---|---|---|---|---|
| 1. | 2.36 – 2.55 | | 7. | 3.21 – 3.51 |
| 2. | 2.45 – 2.71 | | 8. | 3.37 – 3.81 |
| 3. | 2.55 – 2.84 | | 9. | 3.51 – 3.99 |
| 4. | 2.71 – 2.97 | | 10. | 3.81 – 4.09 |
| 5. | 2.84 – 3.21 | | 11. | 3.99 – 4.22 |
| 6. | 2.97 – 3.37 | | 12. | 4.09 – 4.34 |

It is necessary to compare the departments and determine the relative job grades in each. The following chart depicts this information.

| ( No. of jobs in each grade in each dept.) GRADE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Department | | | | | | | | | | | | |
| 1. Foundry | 1 | 6 | 7 | 9 | 3 | 4 | 3 | | | 2 | | 1 |
| 2. Melting | 1 | 1 | 3 | 3 | 5 | 4 | 1 | | 1 | | | |
| 3. Delavaud Casting | | 3 | 1 | | 1 | 3 | 1 | | | | | |
| 4. Shipping & Misc. | 2 | 3 | 4 | 3 | 1 | 2 | 1 | | | | | |
| 5. Maintenance | 1 | 1 | 9 | 4 | 7 | | 1 | | | | | 3 |
| 6. Machine shop | | | | 2 | | 1 | 1 | | 1 | 1 | | 2 |
| 7. Delavaud Finishing | 7 | 6 | 4 | 4 | | 1 | | 1 | | | | |
| 8. Shell core | 1 | 1 | | | 2 | | 1 | | | | | |
| 9. Soil pipe casting | | 1 | | | | 2 | 1 | | 1 | | | |
| 10. Soil pipe finishing | | 6 | 2 | | | | | 1 | | | | |
| 11. Flange pipe | | | 2 | | 2 | | | | 1 | | | |
| 12. Plastic pipe | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | |
| 13. Labor pool | no figures given | | | | | | | | | | | |
| 14. Transportation | no figures given | | | | | | | | | | | |
| 15. Inspectors | | 1 | | 2 | 5 | 1 | | 1 | | | | |
| 16. Storeroom | | | | 1 | 1 | | 1 | | | | | |
| 17. permanent mold | | 1 | 2 | | 2 | | | | | | | |

The above chart reveals that departments in which blacks tend to predominate generally contain jobs which carry a designated labor pay grade lower than other departments. But it also appears that only two of the predominantly white departments (maintenance and machine shop) contain significantly higher numbers of higher labor grades. Perhaps it would be relevant at this point to consider the racial compositions of the respective labor grades. That information is depicted in the following chart:

| Grade | % Black |
|---|---|
| 1 | 80 |
| 2 | 79 |
| 3 | 57.4 |
| 4 | 61.8 |
| 5 | 37 |
| 6 | 34.9 |
| 7 | 6.5 |
| 8 | 5.3 |
| 9 | 0 |
| 10 | 0 |
| 11 | 0 |
| 12 | 0 |

The above figures taken as a whole indicate that there are certain departments in which blacks tend to predominate and that such departments contain generally lower designated labor grades and further that such labor grades are lower paying grades. The chart immediately above indicates the con-

clusion from the other data that blacks predominate in the lower paying jobs at Glamorgan.

Concerning the physical difficulty of the labor in the respective departments, the many job descriptions show that most all of the jobs at Glamorgan involve hard work. The only information which the court has to go on is the job description itself, which consists merely of a brief description of the work performed and the requirements necessary to fill the position. It is difficult to compare these descriptions and make a rational determination as to which jobs are the hardest. They describe different skills in different departments involving different materials. The court concludes that it would be fair to all parties to evaluate the abstract desirability of these jobs by using the labor grade supplied by the company; all involved hard work. Plaintiffs have made no attack on the labor grade classifications or the job descriptions.

■ Defendants submitted charts which tend to show the relative job mobility of blacks and whites at Glamorgan. These figures reveal that from 1969 to 1971, 27.4% of the black employees who signed bids got the job bid for. Twenty-eight and three-tenths percent of whites who signed bids got the job bid for. Thus, blacks are almost exactly as successful as whites in securing jobs through bidding. But those facts may be of less than conclusive significance in the context of this suit. The exhibits do not show what percentage of blacks and whites were able to bid into a new department. The fact that blacks may and have successfully bid on jobs in an already predominantly black department does not necessarily rebut discrimination, even if it tends so to show. If defendants could show that blacks cross bid as successfully as whites, then the only conclusion possible would be that blacks simply do not bid to new departments as frequently as whites. Such a conclusion would certainly be consistent with the live evidence put on by plaintiff which, as before stated, favored the defendants' position. Defendants' exhibit x shows that

well over two hundred transfers from one department to another occurred from 1965 to 1971. About a hundred and thirty involved black employees. It is not shown whether the transfer was because of a bid or because of demotion or being bumped or for other reason. Analysis of exhibit x shows that black movement, for whatever reason, was significantly lower than white movement only in the machine shop, flange pipe department, and the plastic pipe department. One black employee testified that whites were moved around more than blacks and thus had the opportunity to learn more jobs; this, of course, is refuted by the exhibit. Another black employee said he would rather have one job he could do well than be moved around a lot. All in all, the exhibit is instructive, but knowing the reasons for the transfers would have added weight to the exhibit.

The sum of all the evidence in this case is that blacks predominate in certain departments; there are more lower paying jobs in these departments; and blacks fill a higher percentage of the lower paying jobs. Plaintiffs failed to show why the situation exists or that the Company intended for it to exist. Defendants, by the same token, failed to show why the situation exists or that it did not result from racially discriminatory practices, although unintentional.

The court is of opinion that so long as job bids purported to be restrictive, such practice discouraged blacks from bidding out of departments which were predominantly black for whatever reason. There is no evidence that the Company intended for the departmentally restrictive bidding system to discriminate against blacks. Yet the impact of the system was to freeze blacks into certain departments in which they had predominated at the inception of open bidding.

■ On this record, the court is not concerned with employees hired after the beginning of the posting of bids which were not departmentally restrictive. There is a total failure of proof, statistically or otherwise, of any discrimination by the Company

after that date. Moreover, plaintiff has stipulated that they are not in the class. The court is concerned, however, with the black employees hired before jobs were posted at all, during the time when the management simply selected men for promotions, and also with those black employees who may have found themselves in one of the predominantly black departments prior to the inception of open bidding. Such employees hired during this period who fell into one of the predominantly black departments were discouraged from leaving until the restrictive bidding system ended. The only practical relief which comes to mind is to allow any black employee who was in any department which was predominantly black up until restrictive bidding ended to bid out of that department without the risk of losing any pay or seniority. This means that if a bid is posted in any department other than one of the predominantly black departments, a black employee in any of the predominantly black departments may bid on the job, and if he is given the job, he should enter the new department with the departmental seniority and base wage rate (if it is higher) he had in his old department. Incentive pay should play no part in this process. In determining whether the new job has a higher or lower wage rate, the incentive pay an employee may have been earning in his old department should not be considered. Of course, any incentive pay the employees might earn in his new department is likewise not to be considered in determining the base pay. The departments referred to herein as predominantly black departments are the following: melting, Delavaud finishing, and soil pipe finishing, as well as the labor pool. The date to be used as the date on which restrictive bidding ended and open bidding began should be January 1, 1969. Thus, to be eligible for the relief provided, an employee must have been hired prior to January 1, 1969. This is in accordance not only with the end of restrictive bidding on January 1, 1969, but also with an agreed upon order entered by this court on May 2, 1973.

◼ Plaintiffs have also demanded back pay. Title 42 U.S.C. § 2000e–5(g) provides in pertinent part as follows: "The court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include but is not limited to, reinstatement or hiring of employees, with or without back pay . . ." The statute on its face would seem to vest considerable discretion with the trial court and also may be said to authorize back pay only upon reinstatement or hiring of employees, neither of which is present in this case. Whatever discretion a literal reading of the Act may give, the construction of the Act by the circuit court leaves little remaining. The rule in this circuit seems to be that back pay must be awarded unless certain special circumstances exist. *Moody v. Albemarle Paper Co.*, 474 F.2d 134 (4th Cir. 1973).[2] The court did not list the special circumstances but instead cited cases for examples of the existence of such circumstances. An analysis of those cases reveals the following: *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 963 (1968). *Newman* involved attorneys' fees and stated that, absent special circumstances, attorneys' fees should be awarded. In a footnote, it appears that had the case been a borderline case on the merits, and had frivolous defenses not been raised, then perhaps the attorneys' fees question would have been closer. *Newman* teaches that it is relevant to consider the merits of the claims asserted and the merits of the defenses raised. *Schaeffer v. San Diego Yellow Cabs, Inc.*, 462 F.2d 1002 (9th Cir. 1972). *Schaeffer* was a sex discrimina-

---

**2.** *Moody* was later reheard en banc, but the decision of the en banc court was never effected because of a change in the rules in the circuit for senior judges voting on the question of whether or not cases should be heard en banc. See 417 U.S. 622, 94 S.Ct. 2513, 41 L.Ed.2d 358, 42 L.W. 3689. Certiorari has been granted. 414 U.S. 1141, 94 S.Ct. 892, 39 L.Ed.2d 98, 43 L.W. 3349.

tion case in which the defendant refused to allow women to drive cabs more than eight hours a day. Such actions were in accord with State law and no bad faith on the part of the employer was shown. *LeBlanc v. Southern Bell Tel. & Tel. Co.,* 333 F.Supp. 602 (E.D.La.1971), affirmed per curiam, 460 F.2d 1228 (5th Cir. 1972). *LeBlanc* was a sex discrimination suit in which defendant refused to hire women for jobs requiring more than a forty-eight hour week. Such actions were in accord with State law and no bad faith on the part of the employer was shown.

■ These cases must be read in light of the fact that *Moody* also teaches that good faith is no defense to the entry of a back pay award in light of the compensatory nature of such relief. Good faith must, however, be considered as relevant or else the Fourth Circuit's citation of the above cases is meaningless. The above cases require that this court consider the relative merits of the claims and defenses, the good faith of the employer and the existence of some circumstances like State law which authorized the acts complained of. First, the court notes that plaintiff's case was a weak one. Also, in view of the plaintiff's live testimony, to wit: the virtually unfounded claim of Younger and the fact that blacks who testified were treated fairly, the case is yet a borderline one. The defenses raised in this case were not patently frivolous. See *Newman,* supra. There was no evidence of bad faith. The violation of Title VII was not a result of an intentionally discriminatory scheme but rather resulted from a collective bargaining agreement which was discriminatory in its effect to the limited extent that black employees may have been unintentionally inhibited from bidding out of lower end departments.

There was no State law here which specifically required the maintenance of this particular job bidding or departmental seniority system. However, an analogous situation prevailed which was just as strong as State law from defendants' point of view. The job bidding system and the seniority system were embodied in the collective bargaining agreement. The employees were duly represented by the Union which the Company was bound by law to recognize. The Company was likewise bound by law to act pursuant to that agreement. Indeed, the Company would have violated the collective bargaining agreement had it implemented the relief here ordered on its own accord. It is quite relevant that the Union is 50% black and the claim has been abandoned that blacks are not fairly represented within the Union.

The court is of opinion that other factors must also be considered. As the record now stands, it would be sheer guesswork as to who should get back pay and how much, and whether anybody, for that matter, would be entitled to it. In short, the court sees the claim for back pay as rather doubtful. See *Moody,* p. 142; *Lea v. Cone Mills,* 438 F.2d 86 (4th Cir. 1971). The court is also of opinion that the real question with regard to back pay is the question which courts have historically asked when considering relief, and that is how to make the damaged man whole.

■ Under the circumstances of this case, I am definitely of opinion that, if the award of damages is discretionary with the district judge, the facts would compel the exercise of discretion so that damages would not be awarded here. This is especially true when it is considered that the hiring practices of the Company are indeed a model so far as lack of racial discrimination is concerned. Also entitled to considerable weight is the fact that the discrimination found has been contracted for in a collective bargaining agreement between the Company and the Union, which is 50% black, and against which the claim of unfair representation has been abandoned. Other reasons just as compelling suggest themselves from the facts as recited in the opinion. But the court is convinced that *Moody* takes away the discretion of district judges in the award of damages in all cases (for nearly all practical purposes) in which relief may be other than prospective as here, compare *Moody* with *Lea,* unless special circumstances exist such as given as examples in

footnote 5 of *Moody.* Although *Moody* and *Rock v. N&W Ry. Co.,* 473 F.2d 1344 (4th Cir. 1973), do not address the point, I take it that it is not beyond inference that the facts of those cases would be to argue that a union contract is not a defense to back pay. Although the facts here may seem compelling, I can find no special circumstance such as mentioned in *Moody.* Accordingly, the court is of opinion that back pay should be awarded to those employees in the affected class who had desired to transfer out of their respective departments (to departments not within the class) and were inhibited from so doing by virtue of the provisions of the collective bargaining agreement which may have had the unintentional effect of freezing some black employees into low-end employment.

Upon the request of the attorneys, the court will defer a final decision concerning back pay until the decision of the Supreme Court in *Moody.* At such time, the court will also determine whether back pay should be awarded against the Company or the Union, or both. See *Rock,* p. 1350; *Bowe v. Colgate Palmolive Co.,* 416 F.2d 711, 719 (7th Cir. 1969). At that time the court will also enter its final appealable order.

An interlocutory order is this day entered consistent with this opinion.

## SUPPLEMENTAL OPINION ON DAMAGES

On February 26, 1975, this court granted relief to a certain class of persons described as:

"All those black employees and former employees of the [Glamorgan Pipe and Foundry] Company who were employed prior to January 1, 1969, and whose only service to the Company was either in the labor pool, or melting, or Delavaud finishing, or soil pipe finishing departments, any or all of them."

The injunctive relief awarded essentially allowed class members to bid into jobs in non-covered departments on the basis of plantwide seniority for a period of two years, and guaranteed to those class members so bidding that they would be paid at least at the rate of the job from which they were bidding. Glamorgan agreed, without prejudice, to comply with this order and stated that it and the defendant Unions had previously entered into a collective bargaining agreement which provided bidding rights to some extent similar to those ordered by the court.

In its memorandum decision of February 26, the court further indicated that backpay might be owing certain employees in the affected class who had been unable to transfer out of one of the covered departments described above or who were deterred from so doing because of the resulting loss in seniority. At the request of the parties, a final determination as to this issue was deferred pending the Supreme Court's decision in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

Following the decision in *Moody,* the court ordered a hearing to determine which, if any, of the employees of Glamorgan were entitled to backpay. Notice to all prospective claimants was required to be given, and all persons desiring to assert a claim were directed to file a Statement of Claim form with the clerk of this court no later than September 19, 1975. A hearing was thereafter held in Lynchburg, Virginia on October 14 through 17, 1975, at which time it was revealed that a total of 122 claims had been filed.

Of these 122 claims, seventeen were found to have been filed after the September 19 deadline. During the morning and afternoon of October 14, each of these late claimants was afforded an opportunity to present evidence which might have excused their tardiness. Following this hearing, the following claimants were found not to have offered any evidence justifying their late

claims, and, accordingly, their claims were dismissed as untimely: [1]

| | |
|---|---|
| James E. Anderson | John L. Thomasson |
| Robert W. Anderson | Eugene E. Turner |
| Sylvester Anderson | Moses E. Turpin |
| William C. Callaham | Warren C. Tweedy |
| John W. Hicks, Jr. | Lawrence W. West |
| Rudolph Morse | Samual A. White |

The claims of two additional persons Lloyd Evans and Lafayette Robinson, were denied subject to later evidence which would excuse their lateness. No such evidence was ever presented. Accordingly, the claims of both are hereby dismissed as untimely.

■ The claims of the three remaining late claimants, Lawrence T. Leftwich, Walter L. Miller, and Raymond Poe, were allowed on the ground that there were extenuating circumstances excusing their tardiness. In the case of Leftwich, it was shown that he had retired from Glamorgan in 1974 and had not received any notice as to this action. Poe had changed his address and had not received his mail until after the September 19 deadline. Miller had ceased working for Glamorgan in 1968 and had not received any notice of this action. As to each of these claimants, the court was of opinion that their delay in filing the required claim forms was excusable.

■ Of the remaining claims, the court is of opinion that the following must be denied because the claimants were never employed by Glamorgan during the class period:

| | |
|---|---|
| Aaron M. Hayden | Riley M. Johnson |
| William C. Hicks | James A. Smith |
| Robert Humbles | John J. Turpin |

The court's order of February 26 limited the class period to that period beginning July 2, 1965 and ending January 1, 1969.[2] It is clear that persons who left the employ of Glamorgan prior to July 2, 1965 may not recover under Title VII since Title VII backpay liability exists only for practices occurring after the effective date of the Act, July 2, 1965. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 410, n. 3, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Similarly, persons employed by Glamorgan after January 1, 1969, the date when the Company's restrictive bidding policy ended, are not entitled to backpay since they were in no way affected by the practices involved here.

Of the six claimants set forth above, all but Riley M. Johnson were first employed by Glamorgan after January 1, 1969. In the case of Johnson, the evidence at the backpay hearing established that he had left Glamorgan on April 7, 1965, almost three months before Title VII became effective. Accordingly, each of these claims must be denied.

Likewise, the claims of the following persons must also be denied since they were never employed in the labor pool, melting, Delavaud finishing, or soil pipe finishing

---

1. In addition, it should be noted that of these late claimants, the following seven were found not to have been members of the affected class in that they did not work exclusively within one of the covered departments:

| | |
|---|---|
| James E. Anderson | Eugene E. Turner |
| Robert W. Anderson | Warren C. Tweedy |
| John W. Hicks, Jr. | Samual A. White |
| John L. Thomasson | |

An eighth untimely claimant, Moses E. Turpin, was also found not to be a member of the class by virtue of the fact that he was not hired by Glamorgan until after January 1, 1969.

2. This was in accordance with an agreement entered into by the parties during a pre-trial conference in Abingdon, Virginia, on May 2, 1973, in which counsel for the plaintiffs agreed that the class should be limited to "employees of the defendant employer who were employed prior to January 1, 1969." The substance of this agreement is reflected in an order entered by this court on May 4, 1973, which was asked for and signed by counsel for the plaintiffs, the Company, and the Unions.

departments, the covered departments set out in the order of February 26:

| | |
|---|---|
| Warren W. Anderson | Stephen H. Farrow, Jr. |
| William E. Brown | Walter M. Fore, Jr. |
| William T. Burns | Sam W. Hicks |
| Roosevelt F. Callaham | Claude D. Hunter |
| Giles Crews | Marshall A. Seay |
| James E. Elliott | Robert Turner |

The evidence clearly indicates that while employed by Glamorgan, Warren W. Anderson, William E. Brown, Claude D. Hunter, and Walter M. Fore, Jr. worked exclusively in the Special Foundry during the class period. William T. Burns worked in Delavaud Casting during that time while Giles Crews worked in Shellcore. Sam W. Hicks worked in soil pipe casting; James E. Elliott in Maintenance; Roosevelt F. Callaham and Stephen H. Farrow, Jr. in Shipping; and Marshall A. Seay and Robert Turner in Shipping/Miscellaneous. None of these departments is a covered department. As such, these claimants are not members of the class entitled to backpay and their claims are denied.

Similarly, the following claimants are not entitled to an award of backpay since they were not employed exclusively in the class departments during the class period:

| | |
|---|---|
| William E. Barbour | Anslem S. Payne |
| James Bass | Eugene H. Penick |
| Milton E. Broady | Henry L. Reid |
| Charles E. Brown | James W. Robertson |
| Walter L. Brown | Wesley Robinson, Jr. |
| Lenard F. Calloway | George L. Scott |
| Stephen H. Farrow, Sr. | Joseph Scruggs |
| Earl Harvey, Jr. | John J. Spinner |
| Jesse A. Jackson | Joseph E. Spinner |
| Joe Louis Jackson | Walter L. Thomas |
| | Linwood Turner |
| W. L. Johnson | Clifton W. Tweedy |
| Herbert M. Jones | Cleveland White |

By its order of February 26, the court limited the class of persons entitled to relief to those black employees of Glamorgan who were employed solely in one of the four covered departments during the class period. The only basis for this court's finding of discrimination in this case was its determination that certain language which appeared on job bids prior to January 1, 1969, in full accordance with the collective bargaining agreement, was restrictive and may have deterred black employees from transferring out of lower paying departments which were found to be predominantly black. Any black employee who did transfer out of one of the class departments, however, was obviously not deterred by the bid language. As such, he was not discriminated against and cannot claim to have been discriminated against by the bidding practices agreed to by the Company and the Union.

Four additional claimants, Henry L. Reid, James W. Robertson, Wesley Robinson, Jr., and George L. Scott, also worked in non-covered departments during the class period according to the Company. Counsel for the plaintiffs challenges this contention, however. Based upon the evidence adduced at trial, the court is of opinion that it is shown that each of these claimants is not within the class as defined by the court's order of February 26, and that as such they are not entitled to recover in these proceedings.

The evidence indicates that Henry L. Reid was hired by Glamorgan on February 12, 1968. According to the seniority list dated December 31, 1969, the Company's official record of departmental assignments for that year, Reid was assigned to the Soil Pipe Casting department, a non-covered department, for purposes of accrued seniority on May 12, 1968. While there was some evidence presented indicating that Reid may not have in fact begun working in Soil Pipe Casting until February 12, 1969, due to an extended training period, this does not diminish the fact, even taking the evidence most favorable to Reid, that he bid for and received a job in a non-covered department during the class period. So he was not subjected to any discrimination.

■ Similarly, the evidence taken during the backpay proceedings indicates that both James W. Robertson and Wesley Robinson bid for and received job assignments in non-covered departments during the class period, although, due to a period of training, they did not actually commence working in those departments until some time later. As such, for the reasons previously stated, they are not members of the class entitled to an award of backpay. They were not subjected to discrimination.

Finally, as to George L. Scott, the evidence indicates that he worked in one or more of the class departments until September 1, 1968. On that date, he transferred to the job of office janitor. Counsel for the plaintiffs contend that since janitors were assigned to the labor pool, Scott continued to be employed in one of the covered departments. The Company's Personnel Director testified, however, that the job of office janitor differs from that of an ordinary janitor in that the former are members of the Shipping/Miscellaneous Department. Scott himself testified that it was his understanding that his job as an office janitor was in the Shipping/Miscellaneous Department and that he had bid for that position accordingly. Thus, the court is of opinion that Scott, having bid out of one of the covered departments during the class period, is not entitled to recover. He was not subjected to discrimination.

In addition, the claims of the following persons must also be denied since they were employed by Glamorgan only as probationary employees: [3]

| | |
|---|---|
| Andrew J. Cooper | James E. Turpin |
| Camden E. Jones | John Waugh, Jr. |
| Vester Jones | Melvin B. Williams |
| Allen Pollard | |

■ Probationary employees had no contractual bidding rights under the labor agreement so that any discrimination in the contractual bidding process could not have affected them. While it does appear that on occasion some probationary employees did bid on jobs, the Company's director of personnel explained, without contradiction, that such employees could not have challenged the Company's refusal to honor their bid through the contractual grievance procedure. As such, these employees cannot be said to have suffered any injury by virtue of the restrictive language in the bids themselves.

■ In addition to the foregoing employees, the court is of opinion that the following claimants, having worked exclusively in the labor pool during the class period, are not entitled to recover:

| | |
|---|---|
| James R. Holland | Raymond L. Poe |
| Walter L. Miller | Charles E. Snead, Jr. |
| William F. Morton | |

According to the evidence, all employees of the Company began their employment in the labor pool except the very few hired into a specific department to fill an existing vacancy.[4] Because of the nature of the department,[5] there were no promotion opportunities within the labor pool itself, but any employee in the labor pool could advance by moving into other departments as vacancies occurred. Each employee was free to bid on any such job vacancy regardless of the department in which the opening arose. Since such employees accrued only plantwide seniority as opposed to departmental seniority, any such transfer out of the labor pool, unlike a transfer out of the other covered departments, did not entail a loss of any accumulated seniority rights. Given the fact that all employees in the

**3.** During the first ninety days of his employment, any worker at the Company was considered probationary.

**4.** This apparently occurred only when there was no existing employee interested in the job who possessed the necessary skills to perform the work. The court notes again that there is no complaint of racial discrimination in hiring.

**5.** The labor pool has no specific work function, but rather provides a source of employees largely to fill in on a temporary basis for regular employees who are absent, as well as providing a general source of labor. Some janitors are apparently assigned to the labor pool.

labor pool advanced in the same manner and had the same bidding rights, regardless of race, as their departmental peers, the court is of opinion that any claimant who worked exclusively in the labor pool during the class period cannot be said to have been deterred by the contractual bidding procedures and was not locked into that department any more than his white contemporaries working in the labor pool. As such, the claims of these employees must be denied.

As to the remaining claimants, it appears that each was employed during the class period in one or more of the covered departments (exclusive of the labor pool only). As such, each falls within that class of workers which, according to this court's order of February 26, may be entitled to an award of backpay. The question remains, however, what, if any, injuries these individual claimants have suffered as a result of the restrictive bidding practice at Glamorgan.

■ The court begins with the observation that, while each of the remaining claimants may be a member of the class as previously defined, that fact alone does not *per se* entitle each of them to an award of backpay. *Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211 (5th Cir. 1974). Before a claimant may recover, he must establish a causal link between his alleged injuries and the discriminatory practices involved here. *Jackson v. Dukakis,* 526 F.2d 64 (1st Cir. 1975). In essence, he must show a distinct and palpable injury to himself arising from the acts of his employer, for even where such injury is trifling, it must nevertheless be both real and immediate, not conjectural or hypothetical. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ Here, the injuries alleged purportedly arose out of the restrictive bidding practices employed by the Company and the Union. These practices, as has been previously noted, could have tended to deter bids by black employees seeking jobs in one or more of the non-covered departments in the

plant. The burden is upon the individual claimant, however, to show a connection between the injuries claimed and the discriminatory practices employed. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974)

■ Based upon the evidence presented at the backpay hearing, the court is of opinion that the following claimants have failed to make such a showing:

| | |
|---|---|
| Jesse J. Calloway | James H. Rose |
| David Cardwell | Calvin L. Smith |
| Charlie Clark | John A. Smith |
| Marvin Clark | Carl P. Spinner |
| William H. Daniel | Frederick Taylor |
| William Davis | Ardie Thomas |
| Hector Grooms | Mark H. Thomas |
| Vance Herndon | Sidney Thompson |
| Louis A. Jackson | Rudolph L. Thornhill |
| E. M. Jones | Herman Turner |
| William E. Jones | Clarence Wesley |
| Howland Moore | Robert Younger |
| James Morris, Jr. | |

It appears from the record that none of the above claimants has ever attempted to bid out of the covered departments. While this court is cognizant of the fact that their failure to so bid prior to 1969 could have been due to the deterrent effect of the Company's bidding practices, the court is of opinion that once that deterrent was removed, had they desired to transfer to a non-covered department, they would have applied for one or more of the job vacancies arising in those departments. Yet, during the entire period beginning January 1, 1969 and ending December 31, 1975, these claimants did not apply for a single job outside the covered departments. This failure to bid for any job vacancy occurring in the non-covered departments after 1969 renders it impossible for this court to establish, except by conjecture or speculation, any connection between the claimed injuries and the bidding practices employed. *Jackson v. Dukakis,* 526 F.2d 64 (1st Cir. 1964). Moreover, as was pointed out by the Fourth

Circuit in *United Transportation Union v. Norfolk & Western Ry. Co.,* 532 F.2d 336, 341 (4th Cir. 1975), a "voluntary decision to forego higher-paying work opportunities" is evidence that a "particular class member is not entitled to backpay." Accordingly, these claims are denied.

■ Glamorgan points to five additional claimants—Lloyd E. Banks, Kinster W. Davis, John R. Dickenson, Louis A. Jackson, and Calvin L. Smith—who did not attempt to bid out of the covered departments and which it claims are, therefore, not entitled to recover. The court disagrees. It appears that each of these claimants, while never having attempted to bid into one of the non-covered departments, was not in the employ of Glamorgan after December 31, 1968. As such, they were not members of the work force after the Company and the Union had ceased restrictive bidding. Having found that these procedures may have deterred blacks from seeking jobs outside the covered departments, the court is not disposed to charge their failure to bid during the class period against the claimants so as to deny recovery. As such, the claims of these five former employees will be allowed.

■ As to the remaining twenty-four claimants, it appears that each has, either during the class period or at some time thereafter, sought to fill a job vacancy occurring outside the covered departments. These efforts, though minimal in many cases, are sufficient in the eyes of the court to establish a desire on the part of these claimants to transfer from the lower paying departments in which those of their race tended to predominate. As such, they have shown a sufficient causal connection between their alleged injuries and the bidding policies of the company to warrant recovery. The sole issue remaining then is what, if any, losses these remaining claimants have incurred.

■ In determining what amount of backpay each individual may be due, the court is cognizant of the fact that the purpose of such an award is to make the person whole for injuries suffered on account of unlawful employment discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Moreover, as was noted by the Fifth Circuit in *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974), the method of calculating an award of backpay cannot be rigid. As was there stated:

> "This results from the impossibility of calculating the precise amount of back pay. There is no way of determining which jobs the class members would have bid on and have obtained if [a] discriminatory . . . bidding system . . . had not been in existence." *Id.* at 260.

I nevertheless recognize that the individual claimants bear the initial burden of establishing entitlement to the amount of backpay requested. *Pettway* at 259–60.

■ Glamorgan argues that in order to show entitlement, each claimant must now identify the specific job which they desired but was discouraged from seeking. While there is arguable merit to the Company's position, it is to be remembered that the discriminatory acts here under review took place during a period which ended some seven and one-half years ago. Undoubtedly, it would be impossible for the individual claimants to recreate the past with the exactitude the Company seeks. To ask these claimants to now specify what jobs they would have sought but for the bidding procedures then in place is to ask for that which cannot be done, for there can be no doubt that, at this late date, it would be extremely difficult for any of these remaining claimants or the court to determine what psychologically motivated a particular individual to forego application for a specific job vacancy: e. g. satisfaction with the position then held or a desire to avoid being subjected to the discriminatory contractual bidding system. Accordingly, under the facts of this case, Glamorgan's proposed method for calculating backpay is rejected.

Instead, the court is of opinion, based upon the circumstances surrounding this case, that in calculating the amount of backpay, to which each claimant may be entitled, the method contended for by the plaintiffs is a not unreasonable, fairly objective one. Essentially, plaintiffs' theory calls for a comparison of the earnings of the individual claimants with the earnings of those white employees of Glamorgan who were hired the same year as that claimant. The difference in these earnings, according to the plaintiffs, could then be viewed as *prima facie* evidence as to the amount of backpay owing that individual.

This method, imprecise though it may be, appears consistent with the liberal approach to backpay taken by the Fourth Circuit in *United Transportation Union v. Norfolk & Western Ry. Co.,* 532 F.2d 336 (4th Cir. 1975). It should be noted, however, that once this evidence as to entitlement has been presented, the defendants are free to offer proof tending to negate the claimants showing: e. g., the defendants may show that the claimant is less qualified than the group of employees to which he is compared or that his annual rate of absenteeism is higher than average, thus accounting for the disparity in his annual earnings. Moreover, if the defendants establish any such defense "by a preponderance of the evidence," the individual claim to which the defense goes may be overcome and the award reduced or denied. *United Transportation Union v. Norfolk & Western Ry. Co., supra.* With this in mind, the court turns to the evidence presented as to the remaining individual claimants.

### 1. *Charles L. Alexander*

The evidence offered at the backpay hearing indicates that Alexander was first hired by Glamorgan on May 10, 1967. During that year, he earned a total of $2,567.58. His white counterparts hired during that same year earned an average of $3,277.06, or $709.48 more than Alexander. In 1968, this claimant earned $4,096.95, while his

white counterparts earned $4,873.23, or $776.28 more than he did. The defendants offered no evidence which would indicate that Alexander was less qualified than those whites to which he was compared or that the disparity in earnings was due to a higher rate of absenteeism on the claimant's part. As such, the court is of opinion that Alexander is entitled to an award of backpay in the amount of $1,485.76.

### 2. *Norvell Anderson*

The evidence offered on behalf of Anderson indicates that he was first hired by Glamorgan on July 18, 1956. In 1965, Anderson earned a total of $5,355.56, while those whites hired in 1956 earned an average of $5,676.73, or $321.17 more than the claimant. Because Title VII did not become effective until July 2 of that year, however, the court is of opinion that only half of this differential or $160.58 may be considered for purposes of backpay. As to the remaining years, 1966 through 1968, it appears that Anderson earned $3,102.34 less than his white counterparts. Again, as to this claimant, the defendants offered no evidence which would tend to mitigate against this claimant's *prima facie* showing of entitlement. Accordingly, the court is of opinion that Anderson is due $3,262.92 in backpay.

### 3. *Lloyd E. Banks*

The employment record of Banks indicates that he was first hired by Glamorgan on May 9, 1966 and was terminated on January 26, 1967. During the course of 1966, he earned $2,178.85, while his white counterparts hired that same year earned $2,903.75. The Company offered evidence indicating that Banks had worked a total of 138 days, while the white employees to which he was compared worked 139 days. Based upon this evidence, it appears that the claimant's average daily rate of pay was $15.78 ($2,178.85/138), whereas his white counterparts worked for an average daily rate of $20.89 ($2,903.75/139). Thus,

Banks worked for 138 days at a rate of pay $5.11 less than those whites hired during that year. The defendants offered no other evidence which would tend to mitigate the amount of backpay which this individual claims. Thus, the court is of opinion that Banks is entitled to an award of backpay in the amount of $705.18 ($5.11 × 138).

### 4. Ted L. Brown

Brown's employment records indicate that he was hired on February 1, 1955. During the year 1965, he earned a total of $6,702.39, while those white employees of Glamorgan hired in 1955 earned only $5,365.53, or $1,336.86 less than the claimant. The same is true for each of the remaining years during the class period. In 1966, Brown earned $7,402.93, as compared to an average among whites of $6,256.09; in 1967, he earned $8,139.54, as compared to $6,024.88; and in 1968, his income for the year was $6,731.55 as against $5,855.54. No evidence was presented on behalf of the claimant to indicate that his earnings exceeded those of his white counterparts as a result of overtime worked or a lesser rate of absenteeism on his part. As such, the court is of opinion that this claimant has failed to establish that he has incurred any injuries, under the plaintiffs' theory for calculating backpay, which would entitle him to an award.

### 5. James Carter

Carter was hired by Glamorgan on May 25, 1966. During that year, he earned $3,276.82 while working 171 days. As such, he earned $19.16 on an average daily basis. Those white employees hired by Glamorgan in 1966 earned an average of $2,885.65 while working 139 days. Thus, the average daily wage for these workers was $20.76. It appears then that this claimant worked for 171 days during 1966 at a rate of pay $1.60 less per day than his white counterparts. Accordingly, the court is of opinion that Carter has established injuries for the year 1966 entitling him to an award of backpay in the amount of $273.60.

For the year 1967, the evidence indicates that Carter earned $5,824.42 while working 277 days. Thus, his daily rate of pay for that year was $21.02. Those whites with whom he was compared earned $5,549.47 in wages for 254 days' work, being compensated at a daily rate of $21.84, or 82 cents per day more than the claimant. Therefore, Carter is entitled to an award of backpay for the year 1967 in the amount of $227.14 (.82 × 277).

Using the same set of calculations for 1968, it appears that Carter was paid, on a daily basis, $5.87 *more* than his white counterparts.[6] Accordingly, the court is of opinion that he has failed to establish for the year 1968 any entitlement to an award of backpay for that year, there being no cognizable injuries under plaintiffs' theory for calculating such an award.

6. 

| | |
|---|---|
| Days worked by the claimant | 192 |
| Days worked by white counterparts | 260 |
| Salary of claimant for 1968 | $5,824.52 |
| Salary of white counterparts in 1968 | $6,360.98 |
| Claimant's average daily rate of pay | $30.33 |
| White counterparts' average daily rate | $24.46 |
| Differential | -$5.87 |

Based upon the foregoing then, the court is of opinion that Carter is entitled to an award of backpay in the amount of $500.74 for injuries suffered during the class period.

6. *Berry Dempsey, Jr.*

Dempsey was first hired by Glamorgan on May 8, 1964. The relevant figures regarding his employment are as follows:

1965

| | |
|---|---|
| days worked by the claimant | 247 |
| days worked by white counterparts | - |
| salary of claimant | $4,733.07 |
| salary of white counterparts | $4,403.86 |
| differential | - 329.21 |

1966

| | |
|---|---|
| days worked by the claimant | 241 |
| days worked by white counterparts | - |
| salary of claimant | $5,892.84 |
| salary of white counterparts | $4,881.87 |
| differential | -1,010.97 |

1967

| | |
|---|---|
| days worked by the claimant | 258 |
| days worked by white counterparts | - |
| salary of claimant | $5,532.19 |
| salary of white counterparts | $5,734.32 |
| differential | 202.13 |

1968

| | |
|---|---|
| days worked by the claimant | 236 |
| days worked by white counterparts | - |
| salary of the claimant | $5,770.30 |
| salary of white counterparts | $5,836.66 |
| differential | 66.36 |

Based upon these figures, the court is of opinion that Dempsey is not entitled to recover for the years 1965 or 1966. In each of those years, he earned more than those whites hired the same year as he was. Plaintiffs offered no evidence indicating that this differential was due to overtime or a lesser rate of absenteeism on the claimant's part. Thus, no injury warranting an award of backpay has been shown.

For the years 1967 and 1968, the claimant has established that he earned a total of $268.49 less than his white counterparts. The defendants have presented no evidence which would tend to indicate that this dif-

ferential was due to fewer days worked on the part of the claimant, nor have they attempted to show that Dempsey was any less qualified than the average white hired in 1964. As such, the court is of opinion that this claimant is entitled to a total award for the class period of $268.49.

### 7. Kinster Davis

The evidence presented at the backpay hearing indicates that Davis was hired by Glamorgan on September 13, 1965, and was terminated on October 6, 1966. In 1965, he worked a total of 53 days while earning $708.80 for the year. His white counterparts hired that same year worked an average of 119 days and earned a total of $1,962.34. Based on this evidence, it appears that Davis was compensated at a daily rate of $13.37, while those whites with whom he was compared were paid an average of $16.49 per day, or $3.12 per day more than the claimant. The Company has offered no evidence which would indicate that Davis was less qualified than his white counterparts. As such, the court is of opinion that Davis is entitled to an award of backpay for 1965 in the amount of $165.36.

Based upon a similar set of calculations for 1966, the last year in which Davis was employed by the Company, the court is of opinion that he has shown that he is entitled to an award in the amount of $653.92, or a total award for the class period in the amount of $819.28.[7]

### 8. John R. Dickenson

Dickenson was first hired by the Company on May 26, 1964. He ceased his employment on September 16, 1966. According to the evidence presented, Dickenson worked 149 days in 1965, for which he was paid a total of $2,296.48. Those white employees of Glamorgan hired in 1964 worked an average of 119 days and were compensated $1,962.34. Thus, it appears that the claimant was paid at an average daily rate of $15.41 ($2,296.48/149), while his white counterparts were compensated at a rate of $16.49 per day ($1,962.34/119), or $1.08 a day more than Dickenson. Had this claimant been paid the same daily pay as those whites hired in the same year as he, he would have earned $160.92 more than he actually did. Again, the defendants have offered no evidence which would tend to indicate that this differential was due to the work ability of the claimant. Accordingly, the court is of opinion that Dickenson has shown damages for the year 1965 in the amount of $160.92. Since no award can be made for acts occurring prior to the effective date of Title VII, however, and since no evidence has been presented indicating which, if any, of the days worked by the claimant were prior to that date, the court assumes, for its purposes here, that the claimant worked one-half of the days worked in 1965 after July 2 of that year. Thus, the claimant is awarded backpay for the year 1965 in the amount of $80.46 ($160.92/2).

Turning to 1966, the evidence indicates that Dickenson worked 179 days that year and was paid $3,074.41. The white employees of Glamorgan with whom Dickenson was compared worked 236 days and were paid $4,896.44. Reduced to an average daily rate of pay, Dickenson received $17.17 daily, while his white counterparts received $20.74 daily, or $3.57 per day more than the claimant. There being no additional evidence presented by the defendants which would explain the differential in daily pay, the court is of opinion that Dickenson is entitled to an award of $639.03 for 1966,

---

7. 1966

| | |
|---|---|
| days worked by the claimant | 122 |
| days worked by white counterparts | 236 |
| salary of the claimant | $1,877.38 |
| salary of white counterparts | $4,896.44 |
| claimant's average daily wage | $15.38 |
| white counterpart's daily wage | $20.74 |
| differential | 5.36 x 122 = $653.92 |

resulting in a total of $719.49 for the class period.

9. *Floyd H. Evans*

The relevant figures as to Evans' employment are as follows:

Hired - February 23, 1965

1965

| | |
|---|---|
| days worked by the claimant | 94 |
| days worked by his white counterparts | 119 |
| salary of the claimant | $1,336.67 |
| salary of white counterparts (average) | $1,962.34 |
| claimant's daily rate of pay | $14.21 |
| white counterparts' daily rate | $16.49 |
| differential | 2.28 x 94 = $214.32 |

1966

| | |
|---|---|
| days worked by the claimant | 266 |
| days worked by his white counterparts | 236 |
| salary of the claimant | $4,070.66 |
| salary of white counterparts (average) | $4,896.44 |
| claimant's daily rate of pay | $15.30 |
| white counterparts' daily rate | $20.74 |
| differential | 5.44 x 266 = $1,447.04 |

1967

| | |
|---|---|
| days worked by the claimant | 263 |
| days worked by his white counterparts | 254 |
| salary of the claimant | $4,435.80 |
| salary of white counterparts (average) | $5,519.47 |
| claimant's daily rate of pay | $16.86 |
| white counterparts' daily rate | $21.73 |
| differential | 4.87 x 266 = $1,295.42 |

1968

| | |
|---|---|
| days worked by the claimant | 245 |
| days worked by his white counterparts | 235 |
| salary of the claimant | $5,005.51 |
| salary of white counterparts (average) | $5,324.84 |
| claimant's daily rate of pay | $20.43 |
| white counterparts' daily rate | $22.65 |
| differential | 2.22 x 245 = $543.90 |

Based upon the foregoing then, it would appear that Evans has established damages in the amount of $3,500.64 for the four years beginning 1965 and ending 1968. Since a portion of those damages presumably accrued prior to the effective date of Title VII, that amount must be reduced accordingly. There being no evidence to indicate what portion of those days worked in 1965 came after July 2, the court assumes that they were distributed equally by month. Given that the claimant worked approximately ten months of that year, four of which were prior to the effective date of the Act, the court hereby reduces the award for that year by $85.73 (4/10ths of $214.32), leaving a total of $3,414.91.

10. *Thomas H. Farrow*

Farrow was hired by the defendant Company on December 10, 1963. According to the evidence presented, he worked 233 days in 1965 and was paid a total of $4,509.87 for that year. As such, he was compensated on an average daily basis at a rate of $19.35. Those white employees of Glamorgan who were hired in 1963 worked an average of 235 days in 1965 and were paid a total of $5,304.05 for the year. Thus, they were paid, on an average daily basis, $22.57, or $3.22 per day more than the claimant. Based upon the number of days worked, had Farrow been paid at the same rate as his white counterparts in 1965, he would have earned $750.26 more than he actually did.

Because the court cannot determine, due to a lack of evidence, what, if any, portion of these earnings would have accrued prior to July 2, the effective date of Title VII, it is again presumed that these earnings were equally distributed over the course of the entire year. As such, the court is of opinion that Farrow is entitled to an award of backpay for the year 1965 in the amount of $375.13 (750.26/2).

Based upon the evidence presented for the remainder of the class period, the court is of opinion that the claimant has established that had he been compensated at a rate of pay comparable to that of his white counterparts, he would have earned $2,604.62 more than he actually did. The defendants have offered no evidence other than the days worked which would mitigate against an award of backpay in this amount. As such, the court is of opinion that Mr. Farrow is entitled to an award totaling $2,979.75 for the entire class period.[8]

8. 1966

```
days worked by the claimant 243
days worked by white counterparts 242

salary of claimant $5,559.15
salary of white counterparts $6,059.06

claimant's daily rate of pay $22.87
white counterparts' daily rate $25.03

differential $2.16 x 243 = $524.88
```

1967

```
days worked by the claimant 236
days worked by white counterparts 258

salary of claimant $4,451.62
salary of white counterparts $6,141.21

claimant's daily rate of pay $18.86
white counterparts' daily rate $23.80

differential $4.94 x 236 = $1,165.84
```

### 11. *Milton T. Ferrell*

Ferrell was hired by Glamorgan on October 8, 1959. In 1965, he earned $4,898.82, while his white counterparts earned $5,688.57. In 1966, the claimant was compensated in the amount of $5,557.72, while those whites hired the same year as he was were paid a total of $7,197.14. Again, in 1967 and 1968, Ferrell was paid less than those whites with whom he was compared. In 1967, the differential amounted to $1,178.57, while in 1968 it amounted to $904.73. The defendant company offered no evidence either as to the number of days worked by the claimant as compared to his white counterparts or as to the qualifications of this claimant vis a vis those whites hired in 1959. Accordingly, the court is of opinion that Ferrell is entitled to an award of backpay equal to the differential in pay between himself and his white counterparts less one-half the differential for 1965 which is presumed to have accrued prior to July 2 of that year. As such, the total award accruing in favor of this claimant is $4,117.60.

### 12. *John D. Franklin*

The evidence presented at the backpay hearing indicated that Franklin was first hired by Glamorgan on June 14, 1965. In 1965, he worked 134 days and was paid $1,980 for an average daily rate of $14.77. His white counterparts hired that year worked an average of 119 days and were paid a total of $1,962.34, which computes on a daily basis to $16.49 or $1.72 per day more than the claimant. As such, Franklin, had he been paid at the same rate as the average white hired that year, would have earned $230.48 more than he did. Because one of the seven months worked in 1965 was prior to July 2, the effective date of Title VII, any award for that year must be reduced accordingly. The court is of opinion, there being no other relevant evidence presented, that Franklin is entitled to an award of backpay for 1965 in the amount of $197.55 (230.48 × $^{6}/_{7}$ths).

As to the remaining years in the class period, the relevant evidence may be summarized as follows:

1966

| | |
|---|---|
| days worked by the claimant | 254 |
| days worked by white counterparts | 236 |
| salary of claimant | $3,949.38 |
| salary of white counterparts | $4,896.44 |
| claimant's daily rate of pay | $15.54 |
| white counterparts' daily rate | $20.74 |
| differential | $5.20 x 254 = $1,320.80 |

Note 8—Continued

1968

| | |
|---|---|
| days worked by the claimant | 247 |
| days worked by white counterparts | 253 |
| salary of claimant | $5,557.71 |
| salary of white counterparts | $6,628.88 |
| claimant's daily rate of pay | $22.50 |
| white counterparts' daily rate | $26.20 |
| differential | $3.70 x 247 = $913.90 |

1967

| | |
|---|---|
| days worked by the claimant | 252 |
| days worked by white counterparts | 254 |
| | |
| salary of claimant | $4,042.90 |
| salary of white counterparts | $5,519.47 |
| | |
| claimant's daily rate of pay | $16.04 |
| white counterparts' daily rate | $21.73 |
| | |
| differential | $5.69 x 252 = $1,433.88 |

1968

| | |
|---|---|
| days worked by the claimant | 221 |
| days worked by white counterparts | 235 |
| | |
| salary of claimant | $4,859.97 |
| salary of white counterparts | $5,324.82 |
| | |
| claimant's daily rate of pay | $21.99 |
| white counterparts' daily rate | $22.65 |
| | |
| differential | .66 x 221 = $145.86 |

Based upon the foregoing then, the court is of opinion that the claimant, in the absence of any evidence which would tend to indicate that he was less qualified than the average white hired the same year as he was, is entitled to a total award of backpay in the amount of $3,098.09.

*13. Connie H. Jackson*

Jackson was first hired by Glamorgan on June 11, 1963. The relevant figures relating to his employment are as follows:

1965

| | |
|---|---|
| days worked by the claimant | 258 |
| days worked by white counterparts | 235 |
| | |
| salary of claimant | $5,040.88 |
| salary of white counterparts | $5,304.05 |
| | |
| claimant's daily rate of pay | $19.53 |
| white counterparts' daily rate | $22.57 |
| | |
| differential | $3.04 x 258 = $784.32 |

1966

| | |
|---|---|
| days worked by the claimant | 240 |
| days worked by white counterparts | 242 |
| | |
| salary of claimant | $5,374.09 |
| salary of white counterparts | $6,069.06 |
| | |
| claimant's daily rate of pay | $22.39 |
| white counterparts' daily rate | $25.07 |
| | |
| differential | $2.68 x 240 = $643.20 |

1967

```
 days worked by the claimant 276
 days worked by white counterparts 258

 salary of claimant $5,935.72
 salary of white counterparts $6,141.21

 claimant's daily rate of pay $21.50
 white counterparts' daily rate $23.80

 differential $2.30 x 278 = $639.40
```

1968

```
 days worked by the claimant 232
 days worked by white counterparts 253

 salary of claimant $6,357.81
 salary of white counterparts $6,628.88

 claimant's daily rate of pay $27.40
 white counterparts' daily rate $26.20

 differential -$1.20 x 232 = -$278.40
```

Based upon the evidence presented as to 1968, the court is of opinion that the claimant, based upon plaintiffs' theory for calculating backpay, has failed to show that he is entitled to an award for that year, having earned $278.40 more than his white counterparts based upon actual days worked. As to the remainder of the class period, the court finds, after reducing the differential in pay for 1965 by one-half to reflect that period prior to the enactment of Title VII, that Jackson has established entitlement to an award of backpay in the amount of $1,674.76.

14. *Louis A. Jackson*

No evidence was offered at the backpay hearing as to the wages earned by the claimant during the class period. As such, the court is of opinion that Jackson has failed to establish any injury as a result of the defendant's actions which would entitle him to an award of backpay.

15. *Lenwood D. Jefferson*

Jefferson was hired by Glamorgan on June 9, 1965. The relevant figures as to his employment are as follows:

1965

```
 days worked by the claimant 128
 days worked by white counterparts 119

 salary of claimant $1,896.52
 salary of white counterparts. $1,962.34

 claimant's daily rate of pay $14.81
 white counterparts' daily rate $16.49

 differential $1.68 x 128 = $215.04
```

1966

| | | |
|---|---|---|
| days worked by the claimant | 246 | |
| days worked by white counterparts | 236 | |
| salary of claimant | $3,744.33 | |
| salary of white counterparts | $4,896.44 | |
| claimant's daily rate of pay | $15.22 | |
| white counterparts' daily rate | $20.74 | |
| differential | $5.52 x 246 = $1,357.92 | |

1967

| | | |
|---|---|---|
| days worked by the claimant | 241 | |
| days worked by white counterparts | 254 | |
| salary of claimant | $3,942.55 | |
| salary of white counterparts. | $5,519.47 | |
| claimant's daily rate of pay | $16.35 | |
| white counterparts' daily rate | $21.73 | |
| differential | $5.38 x 241 = $1,296.58 | |

1968

| | | |
|---|---|---|
| days worked by the claimant | 226 | |
| days worked by white counterparts | 233 | |
| salary of claimant | $4,609.58 | |
| salary of white counterparts | $5,324.82 | |
| claimant's daily rate of pay | $20.39 | |
| white counterparts' daily rate | $22.85 | |
| | $2.46 x 226 = $555.96 | |

On the basis of the foregoing then, the court is of opinion that, after reducing the differential for 1965 to reflect the effective date of Title VII,[9] the claimant has made out a *prima facie* case for an award of backpay in the amount of $3,394.78.

16. *Lawrence Leftwich*

According to the evidence presented at the backpay hearing, Leftwich was first hired by Glamorgan on July 28, 1948. In 1965, he worked a total of 223 days and earned $5,481.43. Those whites still in the employ of the Company who were hired in 1948 worked an average of 254 days in 1965 and earned a total of $5,823.19. Reduced to an average daily rate, the claimant was compensated at a rate of $24.58, while his white counterparts were paid at a rate of $22.92 per day, or $1.66 less than Leftwich. Accordingly, the court is of opinion that this claimant, under plaintiffs' theory for calculating backpay, has failed to establish that he is entitled to an award for the year 1965.

9. Mr. Jefferson worked a total of seven months in 1965, six of which were after July 2. As such, assuming that his earnings were distributed equally over that period, he is entitled to an award for 1965 amounting to $184.32 ($215.04 × 6/7ths).

For the years 1966 through 1968, the record indicates that Leftwich earned a total of $2,252.19 less than the average white employee hired in 1948 and working the same number of days as the claimant.[10] The defendants have offered no evidence which would tend to mitigate against an award in that amount. Therefore, the court is of opinion that Leftwich is entitled to an award of backpay for the years 1966 through 1968 in the amount of $2,252.19.

### 17. *Bryant N. Nowlin*

Nowlin was first hired by Glamorgan on August 31, 1966. In that year, he worked a total of 95 days and earned $1,596.23 in wages, while the average white hired that year worked 139 days and earned $2,885.65. Reduced to a daily basis, Nowlin was paid an average of $16.80 per day in 1966, while his white counterparts were paid $20.76 or $3.96 per day more. Based on the actual number of days worked, had Nowlin been paid at the same rate as the average white hired by Glamorgan in 1966, he would have earned $376.20 more during the year than he actually did.

In 1967, this claimant worked 289 days, while his white counterparts worked an average of 254 days. In terms of gross earnings, Nowlin was paid $5,800.71, while those whites to whom he was compared earned an average of $5,509.47, or approximately $300 less than the claimant. Reduced to an average rate of pay per day, however, Nowlin was, in fact, paid only $20.07, while those whites hired in 1966 were paid at a rate of $21.69 or $1.62 per day more than he was. Thus, had he been paid at a rate comparable to that of the average white employee hired the same year as he was, Nowlin would have earned $468.19 more than he actually did.

10. 1966

| | | |
|---|---|---|
| days worked by the claimant | 256 | |
| days worked by white counterparts | 277 | |
| salary of claimant | $5,753.78 | |
| salary of white counterparts | $6,913.80 | |
| claimant's daily rate of pay | $22.47 | |
| white counterparts' daily rate | $24.95 | |
| differential | | $2.48 x 256 = $634.88 |

1967

| | | |
|---|---|---|
| days worked by the claimant | 243 | |
| days worked by white counterparts | 257 | |
| salary of claimant | $5,518.59 | |
| salary of white counterparts | $6,396.69 | |
| claimant's daily rate of pay | $22.71 | |
| white counterparts' daily rate | $24.88 | |
| differential | | $2.17 x 243 = $527.31 |

1968

| | | |
|---|---|---|
| days worked by the claimant | 250 | |
| days worked by white counterparts | 255 | |
| salary of claimant | $5,347.08 | |
| salary of white counterparts | $6,566.04 | |
| claimant's daily wage rate | $21.38 | |
| white counterparts' daily rate | $25.74 | |
| differential | | $4.36 x 250 = $1,090.00 |

The same holds true for 1968, when the claimant earned $5,617.89 for 249 days' work. His white counterparts in that year earned $6,360.98 for 260 days worked, or $24.46 per day. This compared to $22.60 paid to Nowlin on an average daily basis. Thus, had this claimant been paid at the same rate as the average white hired in 1966, he would have earned $463.14 more than he actually did given the number of days he worked.

Based upon the foregoing and in the absence of any additional evidence which would tend to indicate that this differential in wages was due to the claimant's job qualifications or skills, the court is of opinion that Nowlin is entitled to an award of backpay in the amount of $1,307.53.

18. *William H. Payne, Jr.*

Payne was first hired by the Company on March 11, 1964. In 1965, he earned $4,643.95, while those whites hired the same year as he was earned $4,403.86, or $240.09 less than the claimant. No evidence was presented by the plaintiffs indicating that Payne's higher earnings were due to longer hours worked or a lesser rate of absenteeism. In the absence of such evidence, the court is of opinion that this claimant has not shown an entitlement to an award of backpay for that year.

The same holds true for 1966. In that year, Payne earned $374.33 more than his white counterparts. Again, plaintiffs offered no evidence as to the number of days the claimant actually worked as compared to the average number of days worked by his white counterparts. As such, the court cannot say that this claimant has shown any entitlement to backpay for injuries accruing as a result of the defendants' conduct.

As for the years 1967 and 1968, the evidence offered at the backpay hearing indicates that Payne was paid a total of $1,407.25 less than his white counterparts. The defendants, for their part, offered no evidence as to the number of days worked by the claimant and those whites with whom he was compared which would indicate that the lower wages were due to a higher rate of absenteeism. Moreover, they offered no evidence as to the qualification of the claimant which would mitigate against his claim for backpay. As such, the court is of opinion that Payne, while entitled to no award for the years 1965 and 1966, is entitled to backpay in the amount of $1,407.25 for the years 1967 and 1968.

19. *Theodore R. Pennix*

Pennix was first hired by the Company on August 28, 1950. The relevant figures relating to his employment during the class period are as follows:

```
1965

 days worked by the claimant 223
 days worked by white counterparts 242

 salary of claimant $4,320.65
 salary of white counterparts $5,951.80

 claimant's daily wage rate $19.37
 white counterparts' daily rate $24.59

 differential $5.22 x 223 = $1,164.06
```

1966

| | |
|---|---|
| days worked by the claimant | 255 |
| days worked by white counterparts | 273 |
| salary of claimant | $4,928.01 |
| salary of white counterparts | $6,477.85 |
| claimant's daily wage rate | $19.32 |
| white counterparts' daily rate | $23.72 |
| differential | $4.40 x 255 = $1,122.00 |

1967

| | |
|---|---|
| days worked by the claimant | 231 |
| days worked by white counterparts | 263 |
| salary of claimant | $4,591.78 |
| salary of white counterparts | $6,452.86 |
| claimant's daily wage rate | $19.87 |
| white counterparts' daily rate | $24.53 |
| differential | $4.66 x 231 = $1,076.46 |

1968

| | |
|---|---|
| days worked by the claimant | 243 |
| days worked by white counterparts | 260 |
| salary of claimant | $4,917.66 |
| salary of white counterparts | $6,744.72 |
| claimant's daily wage rate | $20.23 |
| white counterparts' daily rate | $25.94 |
| differential | $5.71 x 243 = $1,387.53 |

There being no additional evidence presented which would indicate that Pennix was less qualified than the average white hired in 1950, the court is of opinion that he is entitled to an award of backpay for the four years included within the class period in the amount of $4,168.02.[11]

20. *Franklin D. Smith*

Smith was hired by the Company on August 2, 1954. In 1965, he worked 233 days and was paid a total of $6,077.12. His white counterparts that year worked 251 days and were paid a total of $6,030.85. Reduced to a daily basis, Smith was paid $26.08 per day, while those whites hired in 1954 averaged $24.02 or $2.06 less per day than the claimant. In the absence of any additional evidence, the court is of opinion that this claimant has failed to show that he is entitled to an award of backpay for 1965 under the plaintiffs' theory for calculating such an award.

11. This figure takes into consideration a reduced award for 1965 based upon the effective date of Title VII. Since that Act became law on July 2, only one-half of the lost wages may be granted the claimant for 1965. This amounts to $582.03.

As to the remaining years in the class period, the relevant employment figures are as follows:

### 1966

| | |
|---|---|
| days worked by the claimant | 243 |
| days worked by white counterparts | 268 |
| salary of claimant | $5,853.66 |
| salary of white counterparts | $6,591.20 |
| claimant's daily wage rate | $24.08 |
| white counterparts' daily rate | $24.59 |
| differential | .51 x 243 = $123.93 |

### 1967

| | |
|---|---|
| days worked by the claimant | 259 |
| days worked by white counterparts | 266 |
| salary of claimant | $6,106.49 |
| salary of white counterparts | $6,627.98 |
| claimant's daily wage rate | $23.57 |
| white counterparts' daily rate | $24.91 |
| differential | $1.34 x 259 = $347.06 |

### 1968

| | |
|---|---|
| days worked by the claimant | 240 |
| days worked by white counterparts | 266 |
| salary of claimant | $5,630.67 |
| salary of white counterparts | $6,992.67 |
| claimant's daily wage rate | $23.46 |
| white counterparts' daily rate | $26.28 |
| differential | $2.82 x 240 = $676.80 |

Based upon the foregoing and in the absence of any additional evidence presented by the defendants which would explain the differential in the wages of the claimant and that of the average white hired by the Company in 1954, the court is of opinion that Smith is entitled to an award of backpay for the years 1966 through 1968 in the amount of $1,147.79.

### 21. *James N. Stevens*

Stevens was hired by the Company on April 17, 1968. During that year, he earned a total of $3,175.56, while those whites hired that year earned $2,979.65. There being no other evidence presented, the court is of opinion that this claimant, based upon plaintiffs' theory of recovery, has failed to establish that he is entitled to an award of backpay.

### 22. *Raymond Stokes*

The evidence presented at the backpay proceedings indicates that Stokes was first hired on August 10, 1966 and worked through September 9, 1968. In 1966, he worked eighty-seven days and was paid a total of $1,814.18. The average white em-

ployee of Glamorgan hired that year worked 139 days and was paid $2,885.65. On a daily basis, Stokes averaged $20.85, while the white counterparts received $20.76 or nine cents less per day than the claimant. Since the evidence indicates that Stokes was earning more per day than his average white counterpart, the court is of opinion that this claimant has failed, under plaintiffs' theory for recovery, to establish entitlement to an award of backpay for 1966.

In 1967, Stokes worked for 238 days, earning a total of $3,750.39. His white counterpart, on the other hand, worked 254 days and was paid a total of $5,509.47 for the year. Again, reducing these figures to a daily rate of pay, it appears that the claimant was compensated at a rate of $15.75 per day, while the average white hired in 1966 received $21.69 or $5.94 more than he did. Thus, had Stokes been compensated at the same rate as the average white employed at the same time as he was, he would have earned $1,413.72 more than he actually did.

The same is true for 1968. In that year, Stokes earned $3,095.63 while working 155 days. The average white earned $6,360.98 for 260 days' work, however. On a daily basis, the claimant earned $19.97 per day or $4.49 less than the average of those whites to whom he was compared. As such, and for the same amount of work, Stokes would have earned $695.95 for the year had he been paid at a rate comparable to the average white hired in 1966.

Based upon the foregoing then, the court is of opinion that this claimant is entitled to an award of $2,109.67 in backpay for the years 1967 and 1968.

### 23. *Jesse E. Rose*

Rose was hired by Glamorgan on November 11, 1952. The relevant figures relating to his employment are as follows:

1965

| | |
|---|---|
| days worked by the claimant | 246 |
| days worked by white counterparts | 261 |
| salary of claimant | $4,319.47 |
| salary of white counterparts | $6,314.70 |
| claimant's daily wage rate | $17.55 |
| white counterparts' daily rate | $24.19 |
| differential | $6.64 x 246 = $1,633.44 |

1966

| | |
|---|---|
| days worked by the claimant | 267 |
| days worked by white counterparts | 286 |
| salary of claimant | $5,248.67 |
| salary of white counterparts | $7,352.40 |
| claimant's daily wage rate | $19.65 |
| white counterparts' daily rate | $25.70 |
| differential | $6.05 x 267 = $1,615.35 |

1967

```
days worked by the claimant 269
days worked by white counterparts 272

salary of claimant $5,770.18
salary of white counterparts $7,164.31

claimant's daily wage rate $21.45
white counterparts' daily rate $26.33

differential $4.88 x 269 = $1,312.72
```

1968

```
days worked by the claimant 253
days worked by white counterparts 277

salary of claimant $5,438.09
salary of white counterparts $7,514.28

claimant's daily wage rate $21.49
white counterparts' daily rate $27.12

differential $5.63 x 253 = $1,424.39
```

———

There being no other evidence offered, the court is of opinion that Rose is entitled to an award of backpay in the amount of $5,169.18, which reflects a reduction in the 1965 differential to reflect the effective date of Title VII.

### 24. *Larking D. Rosser*

Rosser was first hired by Glamorgan on May 11, 1966. During that year, he worked 177 days and was paid a total of $3,169.38. The average white hired that same year worked an average of 139 days while earning $2,885.65. Reduced to an average daily rate, Rosser was paid $17.90 per day, while his white counterparts were paid $20.76 or $2.86 per day more than the claimant. Thus, had Rosser been paid at a rate equivalent to that of the average white, he would have earned a total of $506.22 more than he actually did.

In 1967 and 1968, Rosser again earned less on a daily basis than his white counterparts.[12] The defendants have offered no

12. The relevant figures concerning Mr. Rosser's employment during 1967 and 1968 are as follows:

1967

```
days worked by the claimant 274
days worked by white counterparts 254

salary of claimant $5,421.95
salary of white counterparts $5,509.47

claimant's daily wage rate $19.78
white counterparts' daily rate $21.69

differential $1.91 x 274 = $523.34
```

evidence which would indicate that this differential was due to the qualifications or skills of the claimant. As such, the court is of opinion, based upon the evidence presented, that Rosser is entitled to an award of $1,540.62.

as compared to those whites hired in 1964. As such, the court is of opinion that Tanner has failed to establish any injury as a result of the defendants' actions which would entitle him to an award of backpay.

### 25. *Robert E. Tanner*

Tanner worked for Glamorgan from 1964 to 1966. No evidence was offered at the backpay hearing, however, as to the wages earned by this claimant during this period

### 26. *Edward H. Taylor*

Taylor was first hired by the Company on June 18, 1963. The relevant figures relating to his term of employment during the class period are as follows:

1965

```
 days worked by the claimant 243
 days worked by white counterparts 235

 salary of claimant $5,544.53
 salary of white counterparts $5,304.05

 claimant's daily wage rate $22.81
 white counterparts' daily rate $22.57

 -$ .24 x 243 = -58.32
```

1966

```
 days worked by the claimant 272
 days worked by white counterparts 242

 salary of claimant $5,657.89
 salary of white counterparts $6,059.06

 claimant's daily wage rate $20.80
 white counterparts' daily rate $25.03

 differential $4.23 x 272 = $1,150.56
```

Note 12—Continued

1968

```
 days worked by the claimant 253
 days worked by white counterparts 260

 salary of claimant $5,678.86
 salary of white counterparts $6,360.98

 claimant's daily wage rate $22.44
 white counterparts' daily rate $24.46

 differential $2.02 x 253 = $511.06
```

1967

| | |
|---|---|
| days worked by the claimant | 282 |
| days worked by white counterparts | 258 |
| salary of claimant | $6,248.44 |
| salary of white counterparts | $6,141.21 |
| claimant's daily wage rate | $22.15 |
| white counterparts' daily rate | $23.80 |
| differential | $1.65 x 282 = $465.30 |

1968

| | |
|---|---|
| days worked by the claimant | 261 |
| days worked by white counterparts | 253 |
| salary of claimant | $6,340.10 |
| salary of white counterparts | $6,628.88 |
| claimant's daily wage rate | $24.29 |
| white counterparts' daily rate | $26.20 |
| differential | $1.91 x 261 = $498.51 |

Based upon these figures then, it appears for the year 1965 that this claimant, under plaintiffs' theory for calculating backpay, has failed to establish that he is entitled to an award for that year. As to the remaining years in the class period, there being no other evidence presented, the court is of opinion that Taylor has shown that he is entitled to backpay in the amount of $2,114.37.

27. *James E. Woodruff*

Woodruff was first hired by Glamorgan on May 16, 1963. For the years 1965 through 1968, he earned more than his white counterparts, the differential being $1,353.49 in 1965, $1,994.24 in 1966, $2,353.21 in 1967, and $2,130.91 in 1968. Plaintiffs have offered no evidence which would indicate that these higher wages were due to overtime worked or that Woodruff was, in fact, paid less on a daily basis than those whites hired the same year as he was. As such, the court is of opinion that Woodruff has failed to show any injury as a result of the defendants' actions which would warrant an award of backpay.

28. *James M. Woodson*

Woodson was first hired by the Company on April 12, 1965. In that year, he worked 169 days and was paid a total of $3,096.17. The average white employee hired that year was paid a total of $1,962.34 for 119 days' work. Reduced to a daily basis, this claimant averaged $18.32 per day, while his white counterpart earned $16.49 or $1.83 less.

The same holds true for the year 1966, when Woodson earned a total of $5,498.99 for 243 days of work. His white counterparts that year earned $4,896.44 for 236 days of work. Reduced to a daily rate, it appears then that Woodson earned $1.88 per day more than the average white hired in 1965.

In 1967, based upon the evidence presented at the backpay hearing, it appears that Woodson worked 227 days and received a total of $4,749.57 in wages. His white counterparts averaged $5,519.47 for the year while working a total of 254 days. On a daily basis then, this claimant was compensated at a rate of $20.92, while the aver-

age white received $21.73, or eighty-one cents more per day than Woodson. Thus, if this claimant had been paid at a rate comparable to his white counterparts in 1967, he would have received $183.87 more than he actually did.

In 1968, however, Woodson again received more in wages than his white counterparts. In that year, he worked 232 days and received $5,292.26, while the average white worked 235 days and received $5,324.82. On a daily basis, the claimant earned sixteen cents more per day than his white counterpart.

Based upon the foregoing then, the court is of opinion that Woodson has shown no injury for the years 1965, 1966, and 1968 which would entitle him to an award of backpay. In 1967, however, the claimant has established that he received $183.87 less than his white counterpart working the same number of days. As such, the court is of opinion that he is entitled to an award for 1967 in that amount.

### 29. Mott M. Johnson

Johnson was hired by the Company on July 27, 1965. The relevant figures concerning his employment during the class period are as follows:

1965

| | |
|---|---|
| days worked by the claimant | 94 |
| days worked by white counterparts | 119 |
| salary of claimant | $1,411.80 |
| salary of white counterparts | $1,962.34 |
| claimant's daily rate of pay | $15.01 |
| white counterparts' daily rate | $16.49 |
| differential | $1.48 x 94 = $139.12 |

1966

| | |
|---|---|
| days worked by the claimant | 166 |
| days worked by white counterparts | 236 |
| salary of claimant | $2,507.82 |
| salary of white counterparts | $4,896.44 |
| claimant's daily rate of pay | $15.10 |
| white counterparts' daily rate | $20.74 |
| differential | $5.64 x 166 = $936.24 |

1967

| | |
|---|---|
| days worked by the claimant | 256 |
| days worked by white counterparts | 254 |
| salary of claimant | $3,938.77 |
| salary of white counterparts | $5,519.47 |
| claimant's daily rate of pay | $15.38 |
| white counterparts' daily rate | $21.73 |
| differential | $6.35 x 256 = $1,625.60 |

1968

| | |
|---|---|
| days worked by the claimant | 233 |
| days worked by white counterparts | 235 |
| salary of claimant | $4,068.13 |
| salary of white counterparts | $5,324.82 |
| claimant's daily rate of pay | $17.45 |
| white counterparts' daily rate | $22.65 |
| differential | $5.20 x 233 = $1,211.60 |

Thus, the evidence indicates that for the entire class period Johnson was paid a total of $3,912.56 less than his white counterparts working the same number of days per year. Again, the defendants have offered no evidence which would tend to indicate that this differential was due to a lack of qualifications on the part of the claimant. As such, the court is of opinion that Johnson is entitled to an award of backpay in the amount of $3,912.56.[13]

CONCLUSION

In summary, the following claimants who were found to have been members of the class and who had, at one time or another since July 2, 1965, sought to fill job vacancies in non-covered departments, are hereby awarded backpay in the following amounts:

| | | |
|---|---|---|
| 1. | Charles Alexander | $1,485.76 |
| 2. | Norvell Anderson | 3,262.92 |
| 3. | Lloyd E. Banks | 705.18 |
| 4. | Ted L. Brown | 0.00 |
| 5. | James Carter | 500.74 |
| 6. | Berry Dempsey, Jr. | 268.49 |
| 7. | Kinster Davis | 819.28 |
| 8. | John R. Dickenson | 719.49 |
| 9. | Floyd H. Evans | 3,414.91 |
| 10. | Thomas H. Farrow | 2,979.75 |
| 11. | Milton T. Ferrell | 4,117.60 |
| 12. | John D. Franklin | 3,098.09 |
| 13. | Connie H. Jackson | 1,674.76 |
| 14. | Louis A. Jackson | 0.00 |
| 15. | Lenwood D. Jefferson | 3,394.78 |
| 16. | Lawrence Leftwich | 2,252.19 |
| 17. | Bryant N. Nowlin | 1,307.53 |
| 18. | William H. Payne, Jr. | 1,407.25 |
| 19. | Theodore R. Pennix | 4,168.02 |
| 20. | Franklin D. Smith | 1,147.79 |
| 21. | James N. Stevens | 0.00 |
| 22. | Raymond Stokes | 2,109.67 |
| 23. | Jesse E. Rose | 5,169.18 |
| 24. | Larking D. Rosser | 1,540.62 |
| 25. | Robert E. Tanner | $ 0.00 |
| 26. | Edward H. Taylor | 2,114.37 |
| 27. | James E. Woodruff | 0.00 |
| 28. | James M. Woodson | 183.87 |
| 29. | Mott M. Johnson | 3,912.56 |
| | TOTAL | $51,754.80 |

The plaintiffs have also sought to have any such backpay awards adjusted upward to reflect such items as retirement and vacation pay. In addition, they have sought adjustments for cost of living increases occurring over the twelve year period since the effective date of Title VII. Whether such adjustments would be appropriate, the court need not and does not decide, however, for the plaintiffs have failed to present any evidence as to the foregoing items despite the opportunities provided. The only proof offered during the week-long backpay hearing, for example, went to the earnings of the individual claimants during the class period and their status as class members. Thus, there is no basis other than speculation upon which this court could make the additional upward

13. No adjustment was made in the 1965 differential since Johnson was not hired until after the effective date of Title VII. Thus, none of the differential in earned wages could have accrued prior to that time.

adjustments in the backpay awards. Accordingly, no such adjustments will be made.

The plaintiffs have also sought frontpay, an award for income lost by the claimants after the end of the class period as a result of the defendants' past actions. They point out that Title VII is intended to make persons whole for injuries suffered on account of unlawful employment discrimination. See, e. g., *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Thus, according to the plaintiffs, in order to provide full restitution to these claimants, they should be granted additional relief in the form of frontpay up to the time when they were presented with an opportunity to bid out of the covered departments. See *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976).

■ Faced with a not dissimilar question, the Supreme Court, in *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), concluded an awarded of seniority retroactive to the date of an individual job application was appropriate under certain circumstances in order to provide the necessary relief for a victim of unlawful discrimination in hiring. The Court there stressed, however, that the fashioning of an appropriate remedy in Title VII actions invokes the sound equitable discretion of the courts. Moreover, it noted that Title VII implicitly recognizes that there may be cases calling for one remedy but not another, and that the choice of remedies in the first instance is left to the district court. Thus, circumstances peculiar to a particular case may justify the modification or withholding of relief for reasons that would not, if applied generally, undermine the purpose of Title VII.

■ Assuming, without deciding, that the court were of opinion that frontpay might be appropriate for some of the class members in the instant case, plaintiffs have again offered no evidence as to when such individual claimants could have first received or been placed in jobs outside the class departments and, thus, according to the plaintiffs, assumed their rightful place in the Company. Instead, all evidence as to pay differentials and job opportunities presented by the plaintiffs was limited to that period prior to January 1, 1969, and this despite the fact that plaintiffs argued the merits of an award of frontpay. Such being the case, the court can but infer that no such evidence existed and that each of the claimants was no longer deterred from bidding after December 31, 1968, and could have in fact bid out of the covered departments shortly thereafter but simply chose not to do so. This conclusion is bolstered by the fact that in 1968, the year the restricted language in the bids was removed, there were approximately seventy job openings throughout the Lynchburg plant of which the successful claimants here bid for only eight. Of these eight bids, they were awarded three of the jobs.

■ Again, there is no basis other than speculation upon which this court could make an award of frontpay to the claimants. Accordingly, no such award will be made.[14]

## ATTORNEYS' FEES

■ This court, by its order of February 26, 1975, has determined that counsel for the plaintiffs are entitled to reasonable attorneys' fees in accordance with Title VII which provides:

> "In any action or proceeding under this subchapter, the court, in its discretion, may allow the prevailing party, other

---

14. In deciding not to grant relief in the form of frontpay because of an absence of proof as to the amount of such pay to which individual claimant is entitled, the court does not consider its ruling in any way undermines the purposes of Title VII. In a proper case where such an award is deemed appropriate and there is evidence upon which to base such an award, relief might well be granted. The court's ruling goes no further than to rule that where a claimant offers no evidence as to either entitlement or amount of frontpay to which he may be entitled, no such award will be made.

than the Commission or the United States, a reasonable attorney's fee . . . ." 42 U.S.C. § 2000e–5(k). In determining what amount should be awarded in this case, the court is of opinion the principles enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, esp. 717–20 (5th Cir. 1974), set out the proper standard which it will follow so far as applicable here. The relevant factors there set forth in this case follow.

*Results Obtained*

 In assessing the reasonableness of an award of attorneys' fees in complex and multi-faceted litigation such as this, the court should consider the results obtained in terms of those sought, and, in so doing, be mindful of not only the injunctive relief granted and the amount of backpay awarded, but also the decision's effect on the law. *Johnson* at 718.

In the instant case, while cognizant of the fact that the injunctive relief granted may affect many of Glamorgan's employees, the court is also aware that plaintiffs alleged in their complaint or raised through motions over fifteen specific allegations of racial discrimination purported to be in violation of Title VII.[15] Yet, despite the numerosity of plaintiffs' charges, they ultimately pre-

vailed only as to their challenge to the Company's bidding system, which was in accord with a collective bargaining agreement. Obviously, then, a substantial portion of the time spent by plaintiffs' attorneys was devoted to issues which they later chose to drop or as to which they did not prevail on the merits.[16]

Typical of the time, attention, and resources expended by the plaintiffs' attorneys on issues as to which they did not prevail is the charge made by the named plaintiff, Younger. Essentially, he charged that he had been discriminated against because of his race in terms of job assignments and wages and that he had been discharged in retaliation for his protests. As the court's opinion of February 26 makes clear, however, these charges were without basis in fact.

It nevertheless appears that a substantial portion of the attorneys' time was devoted to Younger's claim. Seven depositions taken in the course of the litigation were concerned in large part with his allegations. In addition, of the thirteen witnesses that appeared and testified at the trial of this case on the merits, the testimony of seven was directed toward this aspect of the plaintiffs' proof. While it is impossible to tell from the reconstructed time sheets submitted by counsel for the plaintiffs [17] exact-

---

15. Among the allegations were charges that the locker rooms, restrooms, snack bar and clinic at the Lynchburg plant were segregated; that Thomas Younger, the named plaintiff in this case, was transferred because of his race and in retaliation for protests; and that the company refused to promote blacks to supervisory jobs.

16. The court notes that as to those issues on which plaintiffs did not succeed, the defendant company seeks reimbursement as the prevailing party under 42 U.S.C. § 2000e–5(k). While there is arguable logic in Glamorgan's position, the court is of opinion that the statute must be read as allowing such an award to the party generally prevailing, whether such party be the plaintiff or the defendant. Were this not so, courts would be compelled to consider each motion and each issue raised in determining the appropriate allowance for attorneys' fees. This, the court does not consider to be a correct construction of the statute.

Based upon all the circumstances surrounding this case, the court considers the plaintiffs

to be the generally prevailing parties. As such, they are entitled to an award of attorneys' fees to the preclusion of the defendants for a like claim. In so ruling, however, the court does not intend to imply that the issues as to which plaintiffs failed should not be taken into consideration. To the contrary, as is made clear in the body of the opinion, such issues may, and ordinarily should, militate against the total amount awarded.

17. According to one of counsel for the plaintiffs, his firm did not keep hourly records of time spent working for individual clients during the early stages of this case. Consequently, many of the time charges submitted to the court are estimates based upon the individual attorney's recollection of matters in his file. The firm started keeping time records January 1, 1974.

Additionally, the court notes that no effort was made to designate what portion of the case an individual's efforts were directed, so it is not possible to allocate specific hours worked to successful and unsuccessful endeavors.

ly what portion of the total trial preparation time was spent pursuing this element of the case, given the actual time spent at trial on this issue, the court finds that it was a significant portion of the total effort expended by counsel.

As to this aspect of the plaintiffs' case, as well as to the additional issues on which they did not prevail, the court finds the reasoning in *Taylor v. Goodyear Tire & Rubber Co.*, 6 FEP cases 673 (N.D.Ala. 1973), persuasive. There, the court stated:

> "The Court is of the opinion that plaintiffs and intervenors are entitled to a fee for their successful efforts . . . and that their efforts . . . which were unsuccessful cannot be rewarded by the Court. The statute provides for fees to the prevailing party and with respect to these issues plaintiffs did not prevail. It is as if two issues had been brought in a separate suit and defendants had prevailed. Under such circumstances the Court would not be entitled to award fees for the effort. The fact that these contentions were coupled with two other theories on which success was obtained does not change this result. The Court is of the opinion, therefore, that the unsuccessful efforts have to be entirely disregarded." *Id.* at 673.

See also *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 273 (10th Cir. 1975). As to those aspects of the case upon which plaintiffs did not prevail, the court is of opinion no award of attorneys' fees should be made. As such, time expended in pursuit of these charges should be excluded from consideration in arriving at a reasonable award for attorneys' fees. The court hastens to add that the *Taylor* cases draw no bright line here although they should be considered. In addition to the difficulty with segregating the hours spent on productive and non-productive efforts, the court has considered the fact that certain statistical evidence is admissible both as to proof of the individual and class claims. Of course, the plaintiffs' attorneys should get credit for a part of this time but should not get credit for a part of it.

Similarly, the court is of opinion that time devoted at the backpay hearing to claims of non-class members must be excluded from consideration in arriving at a final award. The court's order of February 26, 1975 limited the class entitled to backpay to those employees of Glamorgan hired prior to January 1, 1969 and working exclusively in the affected departments. The January 1 date was arrived at pursuant to an agreement entered into by the parties whereby they agreed that the class should be limited to "employees of the defendant company who were employed prior to January 1, 1969." This order was agreed to and signed by the attorneys for the parties, as is reflected in the court's order of May 4, 1975.

Despite the clear and precise limitations placed upon the class, counsel for the plaintiffs persisted at the backpay hearing in introducing evidence as to claimants who were not class members either because they were hired after January 1, 1969 or because they had not worked exclusively in the affected departments. These efforts to enlarge the class beyond that which was originally found cannot be charged against the defendants. Thus, only that portion of plaintiffs' efforts expended on members of the class may properly be considered in arriving at an allowance for attorneys' fees. Out of 122 claims submitted, plaintiffs litigated 47 at the backpay hearings who were not members of the class.

### The Time and Labor Required

The attorneys for the plaintiffs have submitted statements as to the estimated time and services provided their clients. The defendants have offered no evidence which would indicate any of the items claimed are incorrect (indeed, this would rarely be possible). No attempt was made to show and the court finds no indication that in arriving at the total number of hours devoted to this case there was any misrepresentation on the part of any party. Nevertheless, in reviewing the hours claimed, the court is cognizant of the fact that there has been much duplication of

effort in the preparation and presentation of the case. This is a factor which the court takes into consideration. *Lea v. Cone Mills Corp.,* 467 F.2d 277, 279 (4th Cir. 1972); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Thus, for example, the time of two lawyers in a courtroom or conference, when one would do, should be considered.

Initially, the court notes that during the initial phases of this case, four attorneys became involved. According to their reconstructed time sheets, much time was spent reading and reviewing the work of another attorney for the plaintiffs. For instance, one attorney spent three hours studying a nine-page complaint which it took another plaintiff's attorney sixteen hours to draft. While such preparedness may be laudable, it is clear that there was no effort to maximize the result of their efforts by a division of labor. This fact is made quite clear by the trial itself where plaintiffs were generally represented by no less than four lawyers throughout. By way of contrast, the defendant company, which was adequately represented, never had more than two attorneys present. Certainly, in the opinion of the court, two attorneys would have been sufficient from the standpoint of the plaintiffs.

Another example of the duplicity of effort on the part of plaintiffs' counsel is revealed in the time sheets of the attorneys as they relate to their preparation for the backpay hearing in Lynchburg, Virginia. It appears that prior to that hearing one of the partners was offered an opportunity to travel to Europe. Since the scheduled trip conflicted with the Lynchburg proceedings, it was necessary for him to spend a substantial number of hours with his associates in order that they might be able to handle the case in his absence. In addition, several conferences were required with his partner to familiarize him with the case so that he might serve in the absent partner's stead in supervising the associates' activities during the proceedings. Still another example is that an associate's time for a trip to New York is billed so the associate could review the file when beginning active participation in the case.

This duplication carried over into the backpay hearing itself which was attended by a partner, two associates, and a paralegal, all acting on behalf of the plaintiffs. While the assistance of all may well have been of great help to the attorney conducting the trial, the court is nevertheless of opinion that the case could have been adequately presented by two attorneys rather than three plus the paralegal.

These are but a few of the examples of the duplication of effort by the attorneys for the plaintiffs. In so noting, however, the court does not find that there was any conscious attempt to inflate the hours chargeable to the defendants. The checking and rechecking of another's work, the numerous lawyers present at each stage of the proceedings (ten took part at one time or another), the vast number of hours spent reviewing files and researching may be ascribed to an abundance of caution on the part of counsel. Nonetheless, the court, based upon its observation of the work product and performance of counsel, is of opinion that many of the tasks performed could have reasonably been done in much less time and by fewer lawyers. Accordingly, in arriving at a proper award for attorneys' fees, the element of duplication of time is taken into consideration.

*The Novelty and Difficulty of the Questions*

 This action has been proceeding in this court for several years now. When instituted, many of the questions presented were fairly novel. As such, counsel for both the plaintiffs and defendants were required to expend additional time and effort preparing their respective cases. This is a factor which the court recognizes and is of opinion must be given proper weight in assessing fees.

*The Skill Requisite to Perform the Legal Service Properly*

 As is pointed out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d

714, 718 (5th Cir. 1974), "the trial judge should closely observe the attorney's work product, his preparation, and general ability before the court." This, the court has done. Generally, it can be said that the attorneys for both sides which have appeared before it during the course of this litigation have handled themselves in a competent manner. The court has noted throughout, however, a tendency on the part of the attorneys for the plaintiffs to do too many things at the last minute. This has, for example, manifested itself in terms of a last-minute motion filed at a hearing in Abingdon without having previously given opposing counsel copies. This necessitated postponement of the hearing and the scheduling of additional court proceedings, which has added to the cost of the entire litigation and must, in the court's opinion, weigh against the total award sought.

### Preclusion of Other Employment

█ Quite obviously, plaintiffs' counsel have been precluded to some extent from working on other matters while engaged in this litigation, but no specific instances are brought to the attention of the court. Although such is the nature of all litigation, the court has considered this factor so as not to effectively penalize the attorneys involved for accepting this case.

### The Customary Fee and Fees Charged in Other Cases

█ In general, the attorneys for the plaintiffs are seeking compensation at a rate of $75 an hour for all partners and $50 an hour for all associates actively involved in this litigation. This covers the period of time dating back to the filing of the complaint in 1968. No distinction is made by the plaintiffs between in-court and out-of-court time spent on the case, or between time spent in conferences, engaged in research or traveling. In each instance, the standard $75/$50 fee is sought, although it is obvious that lesser fees should have been claimed for out-of-court time, research, and travel. Travel, especially, should ordinarily be billed at much less than in-court hourly rates. In this respect, it should be noted that not all of the attorneys have billed the time at the same rates, and some distinction is made for different years. A small part of the time billed for attorneys whose status would be that of a partner was at $50 or $60 an hour, but some time of those with the status as associates was billed at $60 an hour. Despite the fact that plaintiffs' attorneys are widely engaged in similar litigation, they have presented to the court no Title VII action in which they were engaged to compare as to the rate of compensation to award. They have offered, in support of their position, numerous affidavits by attorneys practicing in the area stating that the rates sought are reasonable. Assuming agreement that, in light of fees being charged today, the rate of compensation requested by plaintiffs' attorneys might not be unreasonable, the court is unable to say that the same is true for the earlier years involved in this litigation. Proof is not offered to throw light on the subject. Moreover, the court cannot accept counsel's contention that they should be compensated at the same rate for time spent traveling as for time actually spent appearing in court. The same applies to research.

As such, the court is of opinion that the standard rate sought by the plaintiffs is inflated when considered in terms of the years involved and the actual work done. The court is nevertheless of opinion that the affidavits should be considered with all the other evidence in determining the fee.

### Whether the Fee is Fixed or Contingent

█ In the instant case, there has been no agreement between plaintiffs and their attorneys regarding compensation. Also, no such agreement was made concerning expenses. Thus, there is no contractually agreed upon figure which might serve to guide the court in making an award of attorneys' fees. According to counsel for the plaintiffs, had they not prevailed as to that portion of the case as to which they did, they would have received no compensation for their efforts. This would lend an

aura of contingency to the fee arrangement. By the same token, however, counsel for the plaintiffs have also conceded that they have nearly always been paid for their efforts in a Title VII case. Thus, the risk normally associated with ordinary contingent fee cases is less, at least insofar as counsel involved in this action are concerned. The court recognizes that contingent fees are paid later than other fees. Each of the points made are, therefore, relevant considerations in determining the appropriate fee.

*Time Limitations Imposed*

As plaintiffs' counsel has pointed out in brief, this factor has little application here and is accorded only minimal weight.

*The Experience, Reputation and Ability of the Attorneys*

■ The court is cognizant of the fact that the attorneys appearing on behalf of the plaintiffs are skilled civil rights lawyers, each with varying degrees of trial experience. The more senior attorneys appearing for the plaintiffs were, quite obviously, to some degree more skilled than their younger associates, and should be compensated accordingly.

*The Nature and Length of the Professional Relationship*

■ Attorneys often vary their fees depending upon the nature and length of their relationship with an individual client. Regular clients, for example, may be charged a lower fee than a walk-in client. In the instant case, no continuing professional relationship between the attorneys and the claimants has been shown. This should also be considered in arriving at a reasonable fee.

*The Undesirability of the Case*

■ The desirability or undesirability of a particular case or type of case is, to a large extent, a subjective matter within the mind of the individual attorney. Thus, cases involving questions of antitrust law may appeal to some attorneys and not others. The same may be said of civil rights cases. The plaintiffs' attorneys claim that civil rights litigation is distasteful and that should weigh in favor of a larger fee. The fact that they are extensively involved in such litigation, however, shows that it is not distasteful to them. Viewed objectively, there appears nothing about this case which would necessarily render it undesirable for the purposes considered here. There has been no reaction adversely affecting the attorneys involved which has been brought to the attention of the court. As such, the court can only say that this is a neutral factor.

CONCLUSION

The attorneys for the plaintiffs have billed $121,568 for approximately 1901 hours of attorneys' time. They have expended $8,161.74 in out of pocket expenses, plus $4,888 in pay to paralegal employees. The attorneys for the company for defending the same case for a slightly shorter time have billed $47,327.50 for 1096 hours.

■ The statute involved, 42 U.S.C. § 2000e–5(k), does not mention expenses, and they are not recoverable items. Nevertheless, the court recognizes that in the allowance of attorneys' fees, in all manner of cases, courts take into account the out of pocket expenses of the attorney and whether it is reimbursable from his client or as taxable costs. The court has considered the bills for expenses in awarding the fees and given them the proper weight. Some of the expenses claimed, for example, depositions used as evidence are probably reimbursable as taxable costs; while some of them, for example, office help, are probably not reimbursable at all. In addition, the court is handicapped by the fact that no agreement exists between the plaintiffs and their attorneys as to the expenses, and no agreement exists between the plaintiffs' attorneys among themselves as to which, if any, of the expenses should be paid first out of the fee allowance. Despite urging by the court, most of plaintiffs' attorneys have not filed any compensable hourly billings they

have made. Only Mr. Mangum has. His billings for ten cases range from $25 per hour to $87.50 per hour, and averages $51 per hour. Whether any or all were hourly billings is not shown for him. The defendants' attorneys for five other cases have billed from $20 per hour to $60 per hour and have averaged approximately $37 an hour.

█ The court has considered all of the foregoing in arriving at its decision, and is of opinion that $40,000 is a reasonable fee for the plaintiffs' attorneys. After the payment of reimbursable expenses to various of the attorneys it will be divided as follows:

| Attorney | Percentage |
|----------|-----------|
| Marsh | 43.88 |
| Tucker | 1.54 |
| Johnson | 14.73 |
| Bass | 6.45 |
| Mangum | 1.66 |
| Williams | 4.16 |
| Goldstein | 17.53 |
| Belton | 8.19 |
| Valentine | .43 |
| Robinson | 1.43 |
| | 100.00% |

The attorneys will advise the Company as to the amounts of the checks. If they are unable to agree upon the amounts, either the Company or any of the plaintiffs' attorneys may petition the court for a decision on any matter upon which agreement has not been reached.

### Allocation of Financial Liability

█ Turning to the question of the allocation of liability for backpay and attorneys' fees, it must first be noted that the court's decision that the class was entitled to backpay was based upon the finding that job bids posted prior to January 1, 1969 contained language which tended to discourage class members from bidding out of their departments. That language was, however, a reflection of the terms of the collective bargaining agreement which was negotiated by the Company and the defendant Unions. It is clear then that the United Steelworkers of America and Local 2864 agreed to the contract provisions found to be discriminatory and should be held liable for no less than one-half of the total award granted.

█ The defendant Unions claim, however, that this court does not have subject matter jurisdiction over them for the claimed violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This is due to the failure of the plaintiffs to charge them before the Equal Employment Opportunity Commission. It appears that the 1967 charge filed with the EEOC by Younger named only the Company as the offending party. This, then, precludes a finding of liability under Title VII against the Unions, for courts have uniformly held that the language of the Act requires aggrieved persons to first charge those parties they believe to be guilty of discriminatory acts in a complaint before the EEOC. See, e. g., *Richardson v. Miller,* 446 F.2d 1247 (3d Cir. 1971); *Stebbins v. Nationwide Mutual Insurance Co.,* 382 F.2d 267 (4th Cir. 1967). As such, the defendant Unions are not proper defendants as to any Title VII case now before the court.

It also appears that no financial liability may be imposed against the defendant Unions under 42 U.S.C. § 1981. This action was originally instituted solely on the basis of Title VII and was not amended to include a claim under § 1981 until February 9, 1972. Yet, the claim for backpay by the class does not extend beyond January 1, 1969, more than three years prior to the amendment to the complaint. As such, the § 1981 claim was time barred as of the date of the amendment. *Williams v. Norfolk & Western Ry. Co.,* 530 F.2d 539 (4th Cir. 1975). This is true since the filing of the Title VII action did not toll the statute of limitations applicable to any § 1981 liability.

*Johnson v. Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 716, 44 L.Ed.2d 295 (1975). Moreover, given that the amended complaint sought to assert a new and distinct claim rather than simply correct a technical error contained in the original claim, the normal rule with regard to relation back of amended pleadings does not apply. See FRCP 15(c); *Simmons v. Fenton,* 480 F.2d 133 (7th Cir. 1973). Accordingly, the court is of opinion that no financial liability may be imposed against the defendant Unions based upon any claim asserted under 42 U.S.C. § 1981. Similarly, no award of attorneys' fees may be made against the Unions on the basis of § 1981 in light of the Supreme Court's decision in *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

The only remaining theory under which the defendant Unions may be held accountable is under some theory of contribution. The Company has sought to amend its original answer to assert by cross-claim a purported claim against the Unions for contribution. While the court is of opinion that the Unions are equally responsible and should share equally with the Company the financial burden imposed, it has reluctantly come to the conclusion that recovery based upon contribution will not lie under the facts of this case.

In attempting to assert its cross-claim, the Company relies upon § 8–627 of the Virginia Code. That section provides:

"Contribution among wrongdoers may be enforced when the wrong is a mere act of negligence and involves no moral turpitude."

Glamorgan admits, as it must, that the statute has no application to intentional acts. See, e. g., *North River Ins. Co. v. Davis,* 274 F.Supp. 146 (W.D.Va.1967); *Hudgins v. Jones,* 205 Va. 495, 138 S.E.2d 16 (1964). While it is true that there is no indication that the Company and the defendant Unions intended to discriminate, they meant to sign the contract, and, as such, their actions cannot be said to be accidental. Accordingly, § 8–627 is inapplicable here.[18]

As to the Company's assertion that there is some federal common law right of contribution, the court is unpersuaded. This case is controlled by *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937), in which the Court held that there is "no federal general common law." The right of contribution has been held to be statutory, there being no such right at common law. Accord, *Mahone v. McGraw-Edison Co.,* 281 F.Supp. 582 (E.D. Va.1968).

Thus, inequitable though it is, the court is of opinion that the Company must bear the entire financial burden of the backpay and attorneys' fees awards despite the fact that the Unions were parties to the contract and equally responsible.

An order is this day entered consistent with this opinion and the previous opinion of the court.

---

**18.** Glamorgan also seeks contribution under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. That provision affords federal subject-matter jurisdiction to decide cases involving breaches of labor agreements. Quite clearly, there has been no such breach here.